FRANKFORD HOSPITAL

v.

BLUE CROSS OF GREATER
PHILADELPHIA.

Civ. A. No. 74–2281.

United States District Court,
E. D. Pennsylvania.

June 6, 1976.

Sámuel P. Lavine, Carl T. Bogus, Steinberg, Greenstein, Gorelick & Price, Philadelphia, Pa., for plaintiff.

Raymond T. Cullen, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

### NEWCOMER, District Judge.

This suit grows out of a controversy about the criteria for reimbursing hospitals for services rendered to Blue Cross subscribers. Frankford Hospital, individually, seeks damages and injunctive relief against Blue Cross of Greater Philadelphia on the ground that it has violated the federal antitrust laws.[1] On September 25, 1975, this court certified plaintiff the representative—for the purpose of injunctive relief only—of a class consisting of all Pennsylvania non-profit hospitals, clinics, and medical centers that have had a hospital contract with defendant in force at any time during the period September 4, 1970 to September 4, 1974. Extensive discovery followed. At its completion defendant filed a motion for summary judgment. For the reasons stated below this motion will be granted.

---

**1.** Sherman Act §§ 1 and 2, 15 U.S.C. §§ 1 and 2. Plaintiff also alleges a pendent claim under Pennsylvania common law doctrines outlawing certain restraints of trade.

## FACTS NOT IN DISPUTE

Defendant, Blue Cross of Greater Philadelphia, (hereinafter Blue Cross) is a nonprofit corporation which operates hospital plans whereby its subscribers are provided hospitalization and related health services. Defendant is certified to do business in the Commonwealth by the Pennsylvania Insurance Department.[2] Defendant, a member of the Blue Cross Association, headquartered in Chicago, Illinois, is the oldest of five Blue Cross plans in Pennsylvania, and has approximately 2,400,000 subscribers in the Philadelphia area.

Blue Cross is not an insurer in the classic sense of that term. In its contracts with subscribers it agrees to furnish them needed health care services in return for premiums paid by them, or on their behalf (e. g. by employers). In order to carry out these obligations Blue Cross contracts with eligible hospitals.[3] In a typical situation, a subscriber goes to a member hospital,[4] presents his or her Blue Cross card, and receives health care services and the hospital sends the bill directly to Blue Cross. On the other hand, a patient insured under a traditional, private health insurance policy is billed for the services he receives and is entitled to receive cash indemnification by his insurer in an amount determined by his particular policy.

Some of Blue Cross' subscriber agreements include indemnification provisions together with service benefit provisions. The indemnity clause comes into play when a subscriber receives care from a non-member hospital. Under most plans, Blue Cross' obligation is a relatively small fraction of the total charge for the service. For example, a subscriber may collect fifty dollars for the first day of hospitalization and twenty-five dollars for each subsequent day while the hospital's charge exceeds two hundred dollars per day. Blue Cross' role as an indemnity insurer of health care bills is relatively modest, compared to its service benefits business. Apparently, Blue Cross could—as a legal, if not a practical matter—refuse to underwrite any indemnity agreements.

Both the rates Blue Cross charges to subscribers and its rates of payments to hospitals must be approved in advance by the Insurance Department before they can go into effect. 40 Pa.C.S.A. § 6124. At all times material to this action, the Pennsylvania Insurance Department has aggressively regulated Blue Cross' contractual relationships with subscribers and with hospitals. Prior to 1967, there were at least six different agreements between Blue Cross and various hospitals in the Philadelphia area. The Department instructed Blue Cross to develop a uniform contract. It particularly stressed that this contract should include the cost accounting principles upon which reimbursement under the federal Medicare Program was based. At the end of 1967, defendant submitted a proposed uniform cost contract between Blue Cross and Philadelphia area hospitals. The Insurance Commissioner, David O. Maxwell, disapproved it. In his notice of disapproval the Commissioner stated, *inter alia,* that Blue Cross should neither have to pay any portion of the hospitals' unreimbursed outpatient cost, nor to pay for depreciation or for miscellaneous unidentified costs under formulas which did not include specific incentives to hospitals to control costs.[5] Mr. Maxwell's successors—Commis-

---

**2.** At all times material to this action, Blue Cross existed and operated pursuant to the Nonprofit Hospital Plan Act, Act of June 21, 1937, P.L. 1948, § 1 *et seq.,* 40 P.S. § 1401 *et seq.,* as amended by the Act of November 15, 1972, P.L. 1063, No. 271, § 6101 *et seq.,* 40 Pa.C.S.A. § 6101 *et seq.* Certification of nonprofit hospital plans is provided for in 40 Pa.C.S.A. § 6102.

**3.** As defined in 40 Pa.C.S.A. § 6121.

**4.** Member hospitals are those which have contracts with Blue Cross.

**5.** "Section 1–11 of Exhibit A provides for the allowance of certain unreimbursed outpatient costs. [This results from the rendering of services to persons who are not Blue Cross subscribers and who do not fully pay their hospital bills.] The basis of payment is, generally, the ratio of Blue Cross inpatient days to total inpatient days times outpatient costs for which the hospital has not been reimbursed from any source. Blue Cross would of course continue

sioners George F. Reed, Herbert S. Denenberg, and William J. Sheppard—adhered to the position that any contract between Blue Cross and Philadelphia area hospitals must include quality controls and ceilings on total cost reimbursement.[6]

After Commissioner Maxwell's rejection of the 1967 proposed Uniform Cost Contract, Blue Cross resumed negotiations with the hospitals and a new agreement[7] was reached by them and subsequently approved by the Commissioner. In 1971, Blue Cross resubmitted to the Pennsylvania Insurance Department for its approval a request for increases in rates charged to subscribers. Commissioner Denenberg's denial of the request sparked new, intensive negotiations between Blue Cross and the hospitals (which were represented in the negotiations by the Delaware Valley Hospital Counsel, hereinafter DVHC). The Commissioner attended many of the negotiating sessions. These efforts resulted in the Hospital Agreement of 1971, the terms of which reflected Commissioner Denenberg's negotiating guidelines.

Negotiations to reach agreement on a contract to succeed the 1971 Agreement commenced in March 1973. The negotiations, however, were not very successful, and before they were completed the 1971 Agreement expired. At this juncture the hospitals split ranks. In September, 1974, a number of the DVHC-represented hospitals became non-member hospitals. A number of other DVHC-represented hospitals, including the Philadelphia medical school hospitals, agreed with Blue Cross to extend the terms of the 1971 Agreement during the pendency of negotiations. In November, 1974, a number of Philadelphia hospitals reached agreement with Blue Cross on a contract. The Insurance Department approved it. This "1974 Agreement," which was retroactive to July 1, 1974, has been adhered to by all Philadelphia medical school hospitals (including one which did not actually sign it) and has been signed by some DVHC-represented hospitals and a number of community hospitals. Approximately 40 DVHC-represented hospitals refused to sign it.

The situation in which a large number of Philadelphia area health care facilities were not Blue Cross member hospitals created extreme problems for some subscribers in need of treatment. Both Blue Cross and the DVHC took out advertisements in newspapers at various times to inform the public about which hospitals were and were not under contract with Blue Cross to provide subscriber services. Some Blue Cross

---

to pay for outpatient costs incurred by its subscribers."

" . . . It can therefore truthfully be described as an involuntary contribution by Blue Cross subscribers to the maintenance of emergency and clinical outpatient services."

\* \* \* \* \* \*

"In my opinion, the maintenance of these essential facilities is a community responsibility, including federal, state and local governments as well as eleemosynary institutions and the public. It is not fair to shift that part of the burden which the community is neglecting to bear to Blue Cross subscribers without their consent and in accordance with a method of calculation largely unrelated to the cost to the hospital of proving outpatient services." Letter to Mr. Thomas F. Manley, President, Blue Cross of Greater Philadelphia, from Insurance Commissioner, David Maxwell (undated), Exhibit E to Affidavit of Bruce Taylor, President, Blue Cross of Greater Philadelphia, pp. 8–9.

6. In a letter to Blue Cross dated November 6, 1973, Insurance Commissioner Denenberg

made the following comments about "free care":

"This department cannot and will not approve the submitted cost-plus factor. I draw your attention to several basic reasons.

"First, free care, the alleged cause of the plus factor, is not a cost connected with Blue Cross coverage . . . Blue Cross cannot pay for services outside of Blue Cross coverage.

"In short, Blue Cross, itself a nonprofit corporation, is not authorized to make contributions or gifts to hospitals in recognition of free services which may have been provided to the community . . . ."

\* \* \* \* \* \*

"Sixth, the provisions and financing of free care service is a community problem. Costs of free care should be shared by the entire community through appropriations from government funds or otherwise." Exhibit M to Affidavit of Bruce Taylor, pp. 1–3.

7. Uniform Cost Contract—1967.

subscribers sought services in non-member hospitals either by mistake or because of the exigencies of medical emergencies, or for other reasons. It was an unhappy surprise to many when they learned that they were personally liable for substantial bills. On August 2, 1975, the Commonwealth of Pennsylvania enacted Act No. 94 of 1975, (40 Pa.C.S.A. § 6124[c]). It reinstated, retroactively, the 1971 Hospital Agreement between Blue Cross and the non-member DVHC hospitals.[8] Under Act 94, the Blue Cross-hospital contracts may be terminated only after notice is first given to the Insurance Department which then can initiate various procedures during a "cooling off" period. Thirty-one hospitals sent notice to the Commissioner on and after August 25, 1975. In a decision rendered on May 21, 1976, Commissioner Sheppard ruled that he would not approve termination of the contractual relationship. At the same time, he set forth findings—which are comparable to guidelines—on the two remaining disputed areas in the negotiations. Clearly, state regulation of Blue Cross hospital contracts is still vigorous.[9]

Frankford Hospital contends that the 1967 and 1971 Agreements were unreasonable because under them Blue Cross paid for less than its proper share of the operating cost attributable to the treatment of Blue Cross subscribers. It claims that Blue Cross used its position of power and dominance to coerce the hospitals into signing the agreements. The "discount" on hospital services Blue Cross achieved under the contracts, as compared to what non-sub-

scribers and their private insurers had to pay, was allegedly exploited to Blue Cross' advantage in further consolidating a monopoly in the health insurance market. Frankford Hospital asks the court to find that the 1971 Agreement is illegal, and to order defendant Blue Cross to offer to enter into a superseding agreement with members of the plaintiff class. Under the court-ordered contract Blue Cross would pay a prorated share of all operating costs, which included bad debts, free care, and "working capital requirements." Thus, although the plaintiff's theory of liability relates to events occurring in the four years prior to September 4, 1974, its prayer for relief rests on the assumption that federal antitrust law preempts the Commonwealth's Act 94, and this court is therefore obligated to declare unreasonable and unlawful the very contract which the legislature recently reinstated. Blue Cross' principal defense is that the McCarran-Ferguson Act expressly exempts from the federal antitrust laws the activities of which the plaintiff complains. It argues that federal law has, by its own terms, reserved these areas in the first instance for state regulation. Because our decision is firmly grounded on the McCarran-Ferguson Act, we do not discuss Blue Cross' defense based on *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

## McCARRAN–FERGUSON ACT

Frankford Hospital has charged Blue Cross with restraining trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1,[10] and with monopolizing and attempt-

---

**8.** The constitutionality of this act was upheld by a three-judge court in *Guest v. Fitzpatrick,* 409 F.Supp. 818 (E.D.Pa., 1976), *appeal pending.* Judge Luongo dissented from the majority opinion of Judge Weiner and Circuit Judge Van Dusen.

**9.** Commissioner Sheppard ordered that the termination of the contracts be suspended for ninety days. He observed that

"the parties should be able to conclude [the negotiations] successfully within the very near future. . . . " Defendant Exhibit V, p. 3.

It would appear that Commissioner Sheppard, unlike some of his predecessors, is willing to

approve a hospital contract under which Blue Cross bears some share of free care and bad debt costs. He stated:

"[I]t is appropriate and proper for Blue Cross, on behalf of its subscribers, to bear an appropriate portion of certain free care and bad debt costs of member hospitals, after crediting against such free care and bad debt costs the resources available to hospitals for such purposes from sources other than patient payments." p. 2.

**10.** "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal . . . ."

ing to monopolize, in violation of Section 2 of that Act.[11] Blue Cross contends that it has not violated the precepts contained in these Sherman Act provisions and, in any case, these rules themselves are inapplicable to the actions herein challenged by the language of the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.* Section 1012(b) provides in pertinent part:

". . . [T]he Sherman Act . . . shall be applicable to the *business of insurance* to the extent that such business is not *regulated* by State Law." (emphasis supplied)

Excluded from the protection of this exemption are certain practices, namely, boycott, coercion or intimidation. Section 1013(b) of 15 U.S.C. provides:

"Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."

Substantially similar arguments to those advanced by plaintiff in this case were adjudicated in *Travelers Insurance Company v. Blue Cross of Western Pennsylvania,* 361 F.Supp. 774 (W.D.Pa.1972), *aff'd* 481 F.2d 80 (3d Cir.) *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973). After a lengthy trial the district court dismissed plaintiff's complaint on the alternative grounds: a) that the defendant could avail itself of the McCarran-Ferguson Act exemption because its contracts with hospitals were part of the business of insurance; these contracts were aggressively regulated by the Commonwealth of Pennsylvania; and the defendant had not, in connection with these contracts, accomplished an unreasonable restraint of trade through boycott, coercion, or intimidation as those terms are defined in 15 U.S.C. § 1013(b); and b) assuming that the McCarran-Ferguson Act exemption did not apply, Blue Cross of Western Pennsylvania did not engage in

any unlawful monopolization or restraint of trade. The Third Circuit affirmed on each of these grounds.

It is unnecessary to pass beyond the McCarran-Ferguson Act issue in order to decide the present motion. *Travelers* held that the rates Blue Cross of Western Pennsylvania charged its subscribers were so interrelated with the terms of Blue Cross' hospital contracts that the latter should be considered part of the business of insurance. 481 F.2d at 83. That conclusion was based on facts which were alike in all material respects to the undisputed facts in this case. Moreover, the argument that *Travelers* should be distinguished from the instant case either because it involved a different Blue Cross plan and a different set of negotiations, or because a suit brought by a private insurance carrier presented the questions in a different light than a suit brought by a class of hospitals, was destroyed by the recent affirmance of *Doctors Hospital v. Blue Cross of Greater Philadelphia,* Civil Action No. 73–1057 (E.D.Pa. Aug. 13, 1975), *aff'd per curiam* No. 75–2166, 535 F.2d 1245 (3d Cir. April 28, 1976). This narrows our task to making a determination whether there is any triable issue of material fact with respect to Frankford Hospital's assertions that Blue Cross of Greater Philadelphia has carried out acts of boycott, coercion or intimidation prohibited by 15 U.S.C. § 1013(b).[12]

All doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for summary judgment. *Lockhart v. Hoenstine,* 411 F.2d 455 (3d Cir. 1969), *cert. denied,* 396 U.S. 941, 90 S.Ct. 378, 24 L.Ed.2d 244 (1970). At the same time, general allegations which do not show facts in detail and with precision are insufficient to prevent the award of summary judgment. *Tunnell v. Wiley,* 514 F.2d 971, 976 (3d Cir. 1975); *Engl v. Aetna Life Insurance Co.,* 139 F.2d 469, 473

---

11. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a misdemeanor . . . ."

12. Because we conclude that § 1013(b) is inapplicable, it is unnecessary for us to decide whether Blue Cross would be entitled to summary judgment on the ground that its activities in the Philadelphia area did not constitute unlawful monopolization or restraint of trade.

(2d Cir. 1973). A party who resists summary judgment cannot hold back his evidence until the time of trial, *Robin Construction Co. v. United States,* 345 F.2d 610, 613 (3d Cir. 1965), and this is particularly true when the party has taken extensive discovery and has been given every reasonable opportunity to build a record and to draw the court's attention to favorable selections from it.[13]

We find that no material facts are in dispute. The crux of this case is not what Blue Cross has done, but how its actions should be characterized, in the context of section 1013(b). Some hospital administrators have repeatedly asserted that Blue Cross has coerced their institutions to try to force them to sign contracts. Some hospitals have succumbed to the alleged coercion; others have not. Blue Cross does not deny that a hospital which changes from member to non-member status suffers adverse financial consequences, nor that the administrators of a hospital operating under either the 1971 or 1974 Agreement might believe that Blue Cross is not assuming a fair share of hospital costs. But defendant insists that nothing it is doing is coercion. To the contrary, it says it is doing the business that the legislature has intended it to do. In fact, some of the contractual provisions objected to by the plaintiff have been more or less frozen into Blue Cross' negotiating position by the decisions of the Insurance Department.

■■ The terms, "boycott, coercion, or intimidation," must be interpreted with attention to the structure of the statutory provisions to which they are related. The Sherman Act proscribes practices which are monopolistic or are otherwise unreasonable restraints of trade. The McCarran-Fergu-son Act creates an exemption from the Sherman Act provisions, but at the same time allows for an exception to the exemption. In this context, the terms, boycott, coercion, and intimidation, cannot be given as broad a meaning as they might have if used to define unreasonable restraint of trade. Otherwise, the Section 1013(b) exception would all but swallow up the body of the McCarran-Ferguson exemption. The exception must have been aimed at particular known practices in the insurance industry which Congress intended to outlaw irregardless of any efforts undertaken by the state to eliminate them through regulation. In *Meicler v. Aetna Casualty and Surety Co.,* 372 F.Supp. 509 (S.D.Texas 1974) *aff'd,* 506 F.2d 732 (5th Cir. 1975), the district court stated:

"It cannot be disputed that the terms boycott and coercion, as commonly defined, might be construed to encompass the type of activity attributed to defendants in the instant case. An examination of the legislative history of this section reveals, however, that Congress was seeking to regulate a rather narrow area of activity bearing no resemblance to the situation described in Plaintiffs' Complaint. Section 1013(b) was designed *primarily* to deal with conspiracies or combinations among insurance companies and agents for the purpose of boycotting or refusing to deal with other insurance companies and agents." (emphasis supplied) 372 F.Supp. at 513–514.[14]

Frankford Hospital's reliance on *Battle v. Liberty Life Insurance Company,* 493 F.2d 39 (5th Cir. 1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975), is misplaced. In that case the plaintiff was

---

**13.** After oral argument on this motion the court granted the defendant's motion to strike plaintiff's affidavits on the ground that they failed to conform to the requirements of Rule 56(e). Plaintiff was given leave to submit additional affidavits and to file a supplemental brief pointing out pertinent portions of deposition testimony. Order of May 20, 1976.

**14.** We apply emphasis to the word "primarily" because we do not believe section 1013(b) should be strictly limited to the classic situa-tion of insurance company blacklisting. In appropriate circumstances, the language of that provision would reach other practices which have the same purpose and effect as blacklisting or which are equally pernicious in violating the most fundamental notions of competition and fair play. In the instant case we are not presented with circumstances that require us to decide this issue. *But see Addrisi v. Equitable Life Insurance Society,* 503 F.2d 725 (9th Cir. 1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975).

challenging activities of an insurance company (involving an arrangement with an additional party) that had *nothing to do with the issuing of insurance.* The court held that the McCarran-Ferguson Act exemption did not apply to the instant complaint. It explicitly distinguished *Travelers Insurance Company v. Blue Cross, supra.* In *dictum,* the court stated that even if the McCarran-Ferguson Act applied, the complaint would survive a motion to dismiss, because of allegations that brought Section 1013(b) into play. The complaint alleged, *inter alia,* that the defendants threatened to build funeral homes to compete with the plaintiffs' businesses; threatened physical violence against the plaintiffs and their agents; and threatened to cancel insurance contracts. Frankford Hospital has not alleged threats of physical violence, or threats to build competing hospitals, by Blue Cross. Furthermore, it is undisputed that Blue Cross has not threatened to cancel any contracts but rather has continuously offered to enter into the 1971 and 1974 uniform cost contracts with plaintiffs.[15]

█ Frankford Hospital asserts that the provisions in Blue Cross subscriber contracts which set the rates of reimbursement for services received from non-member hospitals are "coercive." The district and the circuit court considered virtually the identical argument in *Travelers, supra,* and reached the conclusion:

> "[T]he economic inducements which made the Blue Cross contract acceptable to hospitals did not amount to 'coercion.'" (footnote omitted) 481 F.2d at 84.[16]

In *Doctors Hospital v. Blue Cross of Greater Philadelphia, supra,* the court rejected the plaintiff's claim that Blue Cross committed an act of boycott, coercion or intimidation by placing an advertisement in a newspaper which informed the public of the date at which Doctors Hospital would no longer be a Blue Cross member hospital. After certain DVHC hospitals became non-member hospitals on or about September 1, 1974, Blue Cross took steps to notify its subscribers of the names of those hospitals which were continuing to provide member benefits to all subscribers. These steps included the running of newspaper notices. Copies of these advertisements are in the record.[17] None of them is any more coercive to non-member hospitals than the inoffensive advertisement considered in *Doctors Hospital.* Even without this precedent, we would have to conclude that these notices were not only non-coercive within the meaning of section 1013(b) but that it was a responsible business decision to communicate to subscribers the information contained therein.

█ We will now discuss the allegations of plaintiff which do not have direct corollaries in *Travelers* and *Doctors Hospital.* First, we consider plaintiff's attempt to give a factual basis to its boycott theory. Assuming *arguendo,* that the term, boycott, in section 1013(b) extends to boycotts of persons other than insurance companies and insurance agents,[18] Frankford Hospital still has not created a triable issue of material fact as to its allegation that Blue Cross has conspired with others or otherwise conducted a boycott of non-member hospitals. Frankford Hospital contends that the defendant's main boycott device is its subscriber contracts, which provide that subscribers who are treated in non-member hospitals receive indemnity from Blue Cross in amounts less than the full charges for those services. The argument is that the

---

**15.** We note, however, that Frankford Hospital contends that Blue Cross has used its existing contractual relationships with the hospitals by intentionally withholding large sums of money which it owes to the hospitals in order to coerce them into signing a new contract.

**16.** The omitted footnote in the above quoted passage stated,

"If a hospital refused to agree to the contract, Blue Cross would reimburse the hospi-

tal on a per diem basis by an amount insufficient to cover the hospital's costs. A hospital would have to make up any deficiency by charging the patient directly. We note that this procedure is typical of the indemnification plans offered by private insurance companies."

**17.** Exhibit P, Q and U to Affidavit of Bruce Taylor.

**18.** *But see, Meicler, supra,* and *Addrisi, supra.*

differential diverts Blue Cross subscribers away from member hospitals and therefore by contracting with hospitals for services Blue Cross is boycotting all hospitals with which it does not contract. Plaintiff also alleges that the defendant has fueled the boycott by running newspaper advertisements that urge subscribers (and, incidently, the general public) to stay away from non-member hospitals, and by conspiring with union officials to exhort union member subscribers from patronizing non-member hospitals. As discussed above *Travelers* and *Doctors Hospital* have disposed of any notion that the terms of Blue Cross indemnity agreements in subscriber contracts and/or newspaper advertisements which Blue Cross has run constitute prohibited boycotts. As to the allegation of a Blue Cross-union conspiracy, Frankford Hospital has to rest much of its argument on a leaflet issued by Local 834 of the United Auto Workers which stated, *inter alia,*

> "[A]gain, we ask you, if at all possible please stay out of the non-participating hospitals."

There is no evidence that Blue Cross either had prior knowledge that this statement would be made or that it encouraged or counseled the making of such a statement. The uncontradicted depositions of Francis J. McGuire, President, United Automobile Workers Local No. 834, and of Cecil V. Mullen, President, International Brotherhood of Electrical Workers Local Union No. 1241, make clear that the leaders of these locals acted at their own initiative to try to protect their members from suffering unexpected financial hardships as a result of going to non-member hospitals. They sought information from Blue Cross in order to advise their members; Blue Cross representatives gave them basic information about coverage under the particular union contracts. On one occasion, a Blue Cross representative said that a subscriber who is treated in a non-member hospital could anticipate being asked to pay his or her bill before checking out. Mr. Mullen volunteered the information that a protest letter he wrote to non-member hospitals contained mistaken assertions. He had made some hasty conclusions based on what he was told by the Blue Cross representative, and based on unreliable information from other sources.[19] Similarly, the comments Mr. McGuire addressed to union members (and are objected to by Frankford Hospital) were based on his own ideas and information.[20]

In conclusion, each of the alleged elements of the "boycott" lacks a factual or a legal basis, if not both.

■ Second, Frankford Hospital alleges that Blue Cross has failed to negotiate with the hospitals in good faith. We fail to see how this allegation, even if true, would activate section 1013(b). Even if we assume that Blue Cross has been able to adhere to unreasonable negotiating positions because of its dominance in the health insurance market, that would take the plaintiff no further than stating an element of a cause of action under the Sherman Act. But the Sherman Act is irrelevant until plaintiff can carry its burden of showing that the McCarran-Ferguson Act does not apply, and the allegation of bad faith negotiations does not prove that point. In any event, we do not think the plaintiff has established a triable question of fact on the good faith of Blue Cross negotiations in the

19. The following exchange in the Mullen deposition illustrates the small role played by Blue Cross representatives:
> "By Mr. Bogus [plaintiff's counsel]: Mr. Mullen, did you have occasion to discuss this matter with any one else at Blue Cross other than Mr. Gannon?
> Mr. Mullen: No, I have a very hard time getting anyone at Blue Cross to talk to me." Deposition p. 14.

20. "Mr. Bogus: Did anyone at Blue Cross tell you that non-participating hospitals were likely to harass or pester your members? [Objected to by Blue Cross counsel]
> Mr. McGuire: No. The hospitals have did it, though. The hospitals have did it. They have harassed and pestered our members. Q: Have you discussed that problem with anyone at Blue Cross?
> A: To the point where, you know what's happening, has there been anything done through negotiations or stuff like that." McGuire Deposition p. 9.

face of the approval by the Insurance Department of the 1971 and 1974 agreements, and in the face of the Commonwealth's enactment of Act 94. Moreover, the participation of the insurance department in the negotiation of hospital contracts is unabated and so long as this active regulation continues it is the province of the commissioner to rule on the good faith or bad faith of the negotiating parties.[21]

There are some remaining allegations of coercion. Plaintiff says Blue Cross has withheld information from non-member hospitals about the benefits that Blue Cross subscriber patients are entitled to; that Blue Cross has refused to honor assignments of benefit agreements which would entitle non-member hospitals to be paid directly by Blue Cross; that Blue Cross has refused to adjust interim rates of reimbursements to hospitals, as required by existing contract; and that Blue Cross has otherwise "systematically ignored and abused clear legal rights of the hospitals." At least two of these alleged actions are the subject matter of state court contract actions and a third has resulted in a settlement. Even if these grievances could support causes of action under state law, and even if they might be unreasonable restraints of trade if that question were ever reached under section 1 and 2 of the Sherman Act, they do not have any bearing on the McCarran-Ferguson Act exception, 15 U.S.C. § 1013(b).

We conclude that judgment must be entered for the defendant on the antitrust claims alleged in the complaint. The subject of this action is the business of insurance and it is being aggressively regulated by the Commonwealth of Pennsylvania. The plaintiff has failed to make a preliminary factual showing that it might, at trial, prove that this case comes under the exception to the McCarran-Ferguson Act's general exemption of regulated insurance activities from anti-trust scrutiny. Furthermore, because judgment will be entered against plaintiff on its federal claims (which conferred jurisdiction on this court) prior to trial, we decline to exercise pendent jurisdiction over its state law claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).[22]

21. See *supra*, at p. 1108.

22. In declining to exercise pendent jurisdiction we have also considered that it is extremely unlikely that we would ever decide the merits of the state law claims in plaintiff's favor. Only a novel state law argument could defeat the otherwise obvious conclusion that Pennsylvania common law doctrines of unfair competition have been preempted by the statutes establishing nonprofit hospital plans and providing for their regulation; and by Act 94. However, before we would base a decision on a novel state law claim we would abstain so that that decision could be made, if at all, in the state courts. Thus, had we exercised pendent jurisdiction the best result the plaintiff could have expected would have been for the court to abstain. Thus it is made no worse off by our failure to exercise pendent jurisdiction.