168 N.J. Super. 68 (1979)
401 A.2d 722
CHICK'S AUTO BODY, A SOLE PROPRIETORSHIP, SALUGA & SONS BODY SHOP, A SOLE PROPRIETORSHIP, SCHAFF'S CARS, INC., A NEW JERSEY CORPORATION, AND SOUTH JERSEY AUTO REBUILDERS ASSOCIATION, PLAINTIFFS,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, AETNA LIFE & CASUALTY, GOVERNMENT EMPLOYEES INSURANCE COMPANY, ALLSTATE INSURANCE COMPANY, KEYSTONE INSURANCE COMPANY AND OHIO CASUALTY COMPANY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided March 5, 1979.
*71 Mr. I. Michael Heine, attorney for plaintiffs.
Mr. Arthur Meisel, for defendant State Farm Mutual Auto Ins. Co. (Messrs. Jamieson, McCardell, Moore, Peskin & Spicer, attorneys).
Mr. John P. Hauch Jr. for defendant Insurance Company of North America (Messrs. Archer, Greiner & Read, attorneys).
*72 Mr. William J. O'Shaughnessy for defendant Aetna Casualty Insurance Company (Messrs Clapp & Eisenberg, attorneys).
Mr. John J. Slimm for defendant Government Employees Ins. Co. (Messrs. Orlando, Forgash & Slimm, attorneys).
Mr. David M. Satz, Jr. for defendant, Allstate Insurance Company (Messrs. Saiber, Schlesinger, Satz & Goldstein, attorneys); Mr. Alan H. Silberman and Ms. Joy S. Goldman of the Illinois Bar appearing.
Mr. Steven Dumser for defendant Keystone Insurance Company (Messrs. Schuenemann & Gercke, attorneys).
Mr. Frederick Fitchett for defendant Ohio Casualty Company (Messrs. Bleakly, Stockwell & Zink, attorneys).
DEIGHAN, J.S.C.
The New Jersey Antitrust Act (N.J.S.A. 56:9-1 et seq.) seeks "To promote * * * growth of commerce and industry * * * by prohibiting restraints of trade * * * through monopolistic practices and which act to decrease competition * * *." Plaintiffs body repair shops invoke the act to decrease competition by compelling defendant insurance companies to pay a higher rate for their repair services than defendants pay to plaintiffs competitors. If successful, the end result would increase the ever-spiralling insurance rates.
After extensive depositions each defendant has moved to dismiss the complaint or, in the alternative, for summary judgment based upon an exemption in the Antitrust Act for, "The activities * * * of any insurer * * * to the extent that such activities are subject to regulation by the Commissioner of Insurance of this State, or are permitted or are authorized by, the Department of Banking and Insurance Act of 1948 (C. [§] 17:1-1 et seq. and the Department of Insurance Act of 1970 (C. [§] 17:1C-1 et seq. (N.J.S.A. 56:9-5(b) (4))."
*73 Plaintiffs admit that plaintiff Association, as a nonprofit Association, has no standing to sue and may not do so on behalf of its members. New Jersey Optometric Ass'n v. Hillman-Kohran, 144 N.J. Super. 411, 428 (Ch. Div. 1976) (affirmed) 160 N.J. Super. 81 (App. Div. 1978).
The three-count complaint charges the participation of defendant automobile insurance companies with (1) "an intentional and organized scheme of fixing prices for repair work throughout the southern New Jersey area". (2) "a practice of boycotting * * * automobile repair shops which did not adhere to the aforedescribed scheme of price fixing" and; (3) "a conspiracy to fix prices," all in violation of the New Jersey Antitrust Act, N.J.S.A. 56:9-1 et seq.
Plaintiff auto body shops estimate and perform repair work on damaged automobiles. A portion of this work includes estimates for repairs to automobiles damaged in accidents, as a result of which the owner is entitled, under his automobile insurance policy, to reimbursement for the damage from his automobile insurance carrier. Defendant insurance carriers adjust automobile damage claims under automobile insurance policies written by them in New Jersey.
Plaintiffs allege that defendants fix the prices which plaintiffs charge for repair to damaged automobiles covered by policies of insurance issued by various defendants. In addition, plaintiffs assert that defendants boycott plaintiff auto body shops if they do not meet prices fixed by defendants, and that defendants conspire to fix prices.
From an affidavit submitted by Insurance Company of North America, payment of automobile physical damage claims comprises the largest single cost element in its premium structure for physical damage coverage within the State of New Jersey. In 1976, payments of automobile physical damage claims in New Jersey represented approximately 60% of the total earned premiums allocable to automobile physical damage coverage within the State of New Jersey.
*74 The affidavit establishes that this cost component has a direct impact upon the premium levels charged for automobile insurance. The repair costs must be actuarially analyzed in order to determine and project future premium rates to cover anticipated costs and earn a reasonable return. As such, the cost of repairs to damaged automobiles represents a vital and integral factor in the rate-making structure. There is, therefore, a direct relationship between payments made by defendant insurance companies to settle automobile physical damage claims and the premium rate structure for automobile physical damage insurance. Premium rates for automobile physical damage insurance are filed with and subject to regulation by the New Jersey Commissioner of Insurance. The facts as to relationship between repair costs and premiums have been also judicially recognized. Travelers Ins. Co. v. Blue Cross of Western Pennsylvania, 361 F. Supp. 774 (W.D. Pa. 1972), aff'd 481 F.2d 80 (3 Cir.1973), cert. den. 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973); Frankford Hospital v. Blue Cross of Greater Philadelphia, 417 F. Supp. 1104 (E.D. Pa. 1976); Manasen v. California Dental Services, 424 F. Supp. 657 (N.D. Cal. 1976); California League of Indep. Ins. Producers v. Aetna Cas. & Sur. Co., 175 F. Supp. 857 (N.D. Cal. 1959); Proctor v. State Farm Mut. Auto. Ins. Co., 182 U.S. App. D.C. 264, 270, 561 F.2d 262, 268 (1977).
After a damaged motor vehicle is taken to an automobile repair shop, an insurance adjuster inspects the vehicle, prepares an estimate which the insurance company will pay to repair the vehicle and negotiates a price with the body shop. Three elements are used in arriving at the "bottom line" cost estimate: (1) parts to be replaced, (2) time to replace parts and (3) hourly labor rate for repair. Plaintiffs admit that insurance adjusters negotiate the first two elements of the cost formula in good faith, but complain that they refuse to pay more than the prevailing competitive hourly labor charges. They further object to a maximum hourly labor rate which each defendant will pay to a repair body shop for auto *75 body repairs. Although they acknowledge that any difference between the hourly labor rate charged by the shop and that paid by the insurance company can be billed to and collected from the automobile owner, they contend that the insurance company should pay their hourly rates even if a competitor shop, using generally accepted standards, properly repairs the damaged vehicle at the hourly labor rate which the insurer was willing to pay.
Despite the gravamen of their objection, plaintiffs admit that they receive an hourly service charge in excess of that fixed by the adjuster because (1) they receive a discount on replacement automobile parts and, in addition, (2) they routinely complete repairs in less time than assigned to the adjuster. In every instance plaintiff repair shops consider the "bottom line" dollar amount in deciding whether to take a job at the estimate repair allowance. If they estimate that completion of the repairs will result in a loss, the job will not be accepted.
The substance of plaintiffs' allegations are that defendants, in adjusting these loss claims, determine the estimated repair costs with the view toward having the necessary repairs performed at the least expensive prices. Plaintiffs complain because they are unwilling to perform repairs as cheaply as other repair shops. Actually, they complain that the "fixed price" is too low and should be higher. In effect, plaintiffs seek to force the insurance companies to increase their service rates, and, in turn, the automobile owners insurance premiums.
The purpose of the insurance exemption under N.J.S.A. 56:9-5(b) (4) has been described as "designed to avoid the situation whereby a state regulatory agency acting pursuant to one statute (the insurance laws) requires conduct which might be held to violate another statute (the Anti-Trust Act)." Borland v. Bayonne Hosp., 122 N.J. Super. 387, 406 (Ch. Div. 1973), aff'd 136 N.J. Super. 60 (App. Div. 1975), aff'd 72 N.J. 152 (1977), cert. den. 434 U.S. 817, 98 S.Ct. 56, 54 L.Ed.2d 73 (1978).
*76 The qualifying words of the statute are "subject to regulation by the Commissioner of Insurance." See, generally, the cases decided under the McCarran Ferguson Act, 15 U.S.C.A. § 1011 et seq.; FTC v. National Cas. Co., 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958); Ohio AFL-CIO v. Insurance Rating Bd., 451 F.2d 1178 (6 Cir.1971), cert. den. 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972); Seasongood v. K & K Insurance Agency, 548 F.2d 729 (8 Cir.1977). The requirement of state regulation to qualify for exemption is abundantly satisfied. The activities alleged in the complaint are regulated by the Commissioner of Insurance in at least three ways, i.e., (1) regulation of the claims adjustment activities of the defendants, (2) regulation of auto damage insurance rates and (3) regulation of unfair and anticompetitive trade practices of insurance companies.

Regulation of the Claims Adjustment Activities of Insurance Companies
By virtue of authority conferred by N.J.S.A. 17:1-8.1 and N.J.S.A. 17:29B-1 et seq., the Commissioner of Insurance adopted an expansive automobile physical damage claims procedure effective May 1, 1976. N.J.A.C. 11:3-10.1 et seq. Pursuant to the regulations, a loss adjustment mechanism was established which delineates the required method for resolving all physical damage claims.
In the case of a partial loss an insurer must inspect or cause to be inspected a damaged vehicle within seven working days following receipt of notice. It must commence negotiation and make an offer of settlement within the same period. N.J.A.C. 11:3-10.3(a). These comprehensive regulations define an "agreed price" and the "reasonable cost to repair the damages to the motor vehicle." N.J.A.C. 11:3-10.2. All obligations of the insurer are then stated in terms of the "agreed price" and "reasonable cost." The insurer is not obligated to assume the cost regardless of the reasonableness *77 thereof. The insurer's decision as to what is a reasonable labor rate is well within the scope of the regulations. Plaintiffs would deny defendants their right, as granted by the regulations, to become actively involved in the process of claims adjusting and to figure their own estimate of the necessary repairs.
The regulations assure the insured the choice of repairer. However, if the insured has no preference as to a repair facility, or if the insured asks the insurer for a recommendation, the insurer "must recommend a qualified repairer who will repair the damaged vehicle at the insurer's estimated cost of repairs." N.J.A.C. 11:3-10:3(d). The insurer must not only recommend a shop, but guarantee its work as well. N.J.A.C. 11:3-10:3(g). Consequently, knowledge of the prices a shop charges, the quality of work it performs, or the guarantee a shop provides, is essential if the insurer itself must guarantee the work of a shop it recommends.
The regulations require that the repairs be made in accordance "with generally accepted standards for safe and proper repairs." N.J.A.C. 11:3-10:3(f, g). If, as plaintiffs contend, defendants authorize incomplete or shoddy repairs such a complaint is properly made to the Commissioner of Insurance.
The complaint of plaintiffs is failure of the defendants to negotiate. Even this is regulated by the Department because all negotiations are required to be conducted in "good faith." N.J.A.C. 11:3-10:3(b). It is further required that the insurer make "all reasonable efforts to obtain an agreed price" with the shop of the customer's choice. N.J.A.C. 11:3-10:3(d). The negotiations must center on the "agreed price," i.e., the "reasonable cost" of repairs, not the particular hourly rates of the plaintiffs. In furtherance of that policy, if an insurer inspects the damaged vehicle, it must furnish to its insured a detailed written estimate of the cost of repair. N.J.A.C. 11:3-10.3(c). The Department of Insurance routinely investigates market performance of insurers *78 to guarantee compliance with the aforesaid regulations, N.J.A.C. 11:3-10.10.
Thus, it is clear that plaintiffs' complaints of the impropriety of the conduct of the defendants are in reality not assertions of antitrust violations, but rather complaints about the negotiation process in the claims settlement procedures. That process is extensively and properly regulated by the Department of Insurance and therefore within the exemption of the New Jersey Antitrust Act.

Regulations of Auto Damage Insurance Rates
The operation of insurance companies within the State of New Jersey is subject to regulation by the Department of Insurance under the Commissioner of Insurance. N.J.S.A. 17:1C-1 et seq. These regulatory powers of the Commissioner of Insurance are set forth generally in Subtitle 3 of Title 17, chapters 17 through 51, of the Revised Statutes.
N.J.S.A. 17:29A-1 et seq. deals with the rates of premiums which may be charged by insurers. N.J.S.A. 17:29A-4 provides that insurers in making rates must adopt rates which are not unreasonably high or inadequate for the safety and soundness of the insurer and which do not unfairly discriminate between risks within New Jersey involving the same hazards and "expense" elements. N.J.S.A. 17:29A-11 authorizes the Commissioner of Insurance to determine whether the rates made by insurers are reasonable and adequate and do not unfairly discriminate. In making this determination the Commissioner of Insurance is directed to consider the factors applied by insurers in determining the bases for the rates, the financial condition of the insurer, the method of operation of the insurer, the past and prospective "loss experience" of the insurer, all factors reasonably related to the kind of insurance involved, and a reasonable rate of return for the insurer. In order to assist the Commissioner of Insurance in this examination N.J.S.A. 17:29A-5 requires that each insurer file an annual statistical *79 report showing a classification schedule of its premiums, its losses on all kinds of insurance, and any other information deemed necessary by the Commissioner of Insurance.
The statutory and regulatory scheme governing insurance companies demonstrates the direct relationship between loss experience on any particular type of insurance and the rate or premium to be charged by this insurance. The supervision and review of rate-making by the Commissioner of Insurance necessarily includes a review of the expense and loss experience of defendants with regard to reimbursement for repairs to damaged automobiles. The activity of defendants in examining, allowing or disallowing estimated repair costs of automobiles has been consistently held to constitute an activity of an insurance company. See cases cited supra.
In Proctor v. State Farm Mut. Auto. Ins. Co. supra, plaintiff was the representative of the owners of four automobile shops who brought suit alleging that the claims adjustment practices of five automobile insurance companies involved price-fixing and a group boycott, in violation of § 1 of the Sherman Act. 15 U.S.C.A. § 1. In affirming the summary judgment in favor of defendants the Court of Appeals concluded that the activities of defendants in the Proctor case fell within the exemption from the Sherman Act for activities of insurers engaged in the business of insurance.
The Court of Appeals concluded that the activities of an insurance company in adjusting and or settling automobile repair claims by examining, allowing or disallowing the cost of repairs, was engaging in the business of insurance. The basis for this conclusion was the relationship between this activity and the contractual obligation of an insurer to reimburse its insured, as well as the relationship between amounts paid for repair costs and the fixing of insurance rates.
The same conclusion was reached by the New Jersey courts in the case of Borland v. Bayonne Hosp., supra. Borland involved the asserted violation of the New Jersey Antitrust Act, alleging that the insurer, Blue Cross agreed with hospitals to fix prices for reimbursement at lower prices *80 than were available to other health insurers. The court, on the basis of the exemption section, N.J.S.A. 56:9-5(b) (4), concluded that the New Jersey Antitrust Act had no application to any agreement between Blue Cross and Blue Shield and hospitals for reimbursement of costs since these were activities of an insurer affecting rates subject to regulation by the Commissioner of Insurance. 122 N.J. Super. at 405-406. In addition, the court specifically referred to the insurance exemption provisions of the Federal McCarran-Ferguson Act and the cases decided thereunder as probative and instructive for determining the scope of the insurance exemption to the New Jersey Antitrust Act.
Lastly, two cases decided in the Third Circuit have been in accord with the Borland decision. In the case of Travelers Ins. Co. v. Blue Cross of Western Pennsylvania, supra, plaintiff alleged that defendant had engaged in unlawful price-fixing, in violation of § 1 of the Sherman Act. The Court of Appeals affirmed the District Court's findings that the hospital payments made by Blue Cross were interrelated, and therefore the arrangement between Blue Cross and the hospital constituted the business of insurance. In accord with this decision is Frankford Hosp. v. Blue Cross of Greater Philadelphia, supra. Frankford Hospital was an action similar to the Travelers Ins. Co. case except that the named plaintiff was a hospital alleging that it had been the victim of price-fixing in violation of § 1 of the Sherman Act. Again, the relationship between the reimbursement costs for hospital services and the rates charged by Blue Cross for insurance was found to be sufficient to sustain a finding that agreements between Blue Cross and hospitals to fix reimbursement costs constituted the business of insurance. Id at 1110-1111.
The prevailing authority is clear that any of the activities of defendants with regard to determining repair costs for physical damage loss under an automobile policy is within the business of insurance subject to regulation by the Commissioner *81 of Insurance. Aside from the authority from the Borland case in determining that insurance contracts fall within the exemption of the New Jersey Antitrust Act set forth in N.J.S.A. 56:9-5(b) (4), the applicable federal judicial interpretations of comparable federal antitrust statutes are also controlling. N.J.S.A. 56:9-18.[1] Again, the insurance exemption of the New Jersey Antitrust Act must be applied.

Regulation of Unfair and Anticompetitive Trade Practice of Insurance Companies
Aside from the review and regulation of insurance rates and the operation of insurance companies in general, the Commissioner of Insurance is specifically empowered to regulate the trade practices of insurance companies. N.J.S.A. 17:29B-1 et seq. This statute was enacted for the stated purpose of regulating trade practices in the business of insurance in accordance with the intent of Congress as expressed in the Act of Congress of March 9, 1945, the McCarran-Ferguson Act, 15 U.S.C.A. §§ 1011 to 1015. N.J.S.A. 17:29B-1.
N.J.S.A. 17:29B-4 enumerates unfair methods of competition and unfair and deceptive acts or practices in the business of insurance which acts are specifically proscribed by N.J.S.A. 17:29B-3 and subject to regulation by the Commissioner.
N.J.S.A. 17:29B-4 provides in relevant part that:
The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:
* * *

*82 (4) Boycott, coercion and intimidation. Entering into any agreement to commit, or by any concerted action committing, any act of boycott, coercion or intimidation resulting or intending to result in unreasonable restraint of, or monoply in, the business of insurance.
* * *
(9) Unfair claim settlement practices. Committing or performing with such frequency as to indicate a general business practice any of the following:
* * *
(f) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear:
* * *
(11) The enumeration of this act of specific unfair methods of competition and unfair deceptive acts and practices in the business of insurance is not exclusive or restrictive or intended to limit the powers of the commissioner or any court of review under the provision of section 9 of this act.
Lastly, N.J.S.A. 17:29B-9 provides that in the event the Commissioner of Insurance determines any insurance company to be engaged in a method of unfair competition or unfair deceptive practice, the Commissioner is authorized to hold hearings and take such action as is necessary to compel cessation of the improper activity.
As was apparent with regard to the fixing of insurance rates and premiums, the statutory scheme for regulation of the competitive practices and claims settlement practices of insurance companies is both comprehensive and expansive. The regulatory scheme of the practices and activities of insurance companies is legislatively stated to constitute regulation as contemplated by the McCarran-Ferguson Act so as to include the New Jersey activities of insurance companies within the business of insurance exception to the Federal Antitrust Laws, 15 U.S.C.A. § 1 et seq.
Furthermore, plaintiffs cannot assert any cause of action under the New Jersey Antitrust Act for an alleged violation of practices proscribed by N.J.S.A. 17:29B-1 et seq. since this statute creates no private right of actions. *83 Retail Clerks Welfare Fund v. Continental Cas. Co., 71 N.J. Super. 221, 225 (App. Div. 1961).
Since defendants claims adjustment practices and procedures are regulated by N.J.S.A. 17:29B-1 et seq., these activities are exempt by operation of N.J.S.A. 56:9-5(b) (4).

The Activities Complained of Do Not Violate the New Jersey Antitrust Act
As has been heretofore stated, the three-count complaint charges defendants with a violation of the New Jersey Antitrust Act in these respects, namely, price fixing, boycotting and a conspiracy.
The first count of the complaint charges defendants with "fixing prices." The "prices" referred to by plaintiffs are the amounts paid by the carriers to their insured and the alleged "price-fixing" referred to is the carrier's refusal to pay more than the prevailing service rates.
In effect, plaintiffs' price-fixing allegation seeks to force defendants to pay them a price higher than the present[2] prevailing service rate ($14) accepted by other body shops in their competitive area. Under the guise of a "price-fixing" claim, plaintiffs seek not to further price competition, but to avoid it. In effect, plaintiffs assert they should not have to compete with other shops on price. They contend, instead, that defendants should be required to pay their insureds whatever price plaintiffs decide to charge them.
Count 1 alleges an "intentional and organized scheme to fix prices" and is explained by one of the plaintiffs to mean that "the insurance companies are dictating our labor, our service rate." This alleged conduct occurs when the insurance company, in fulfilling its contractual obligations to its insureds, estimates the reasonable cost of the necessary repairs *84 at the hourly labor rate used in figuring the total cost for repairs which is common or accepted in the marketplace at the time. Plaintiffs are free to negotiate the "bottom line" or to simply reject the job altoegther.[3] What plaintiffs describe as price-fixing is, in fact, no more than a natural consumer-oriented competitive activity in getting the lowest competitive price.
The second count alleges a "boycott" on the part of defendants. Plaintiffs make frequent use of the term "leveraged shops." As explained by one plaintiff, "leveraged shops" are those included on each carrier's list[4] of those body shops that can be expected to perform repairs within the particular carrier's estimate. There is no contention that anyone willing to work at competitive rates has been excluded from any list.
Plaintiffs do work for insureds of all of defendants; plaintiffs are free to do the work for the defendants' insureds at the estimates written by defendants or to turn the business away; plaintiffs are free to charge and collect from the defendants' insureds any part of the repair price which exceeds the insurance reimbursement, and plaintiffs' allegation that they are "denied" repair work is only that they have in certain instances declined jobs because defendant insurance companies estimate was below plaintiffs' and the insured did not wish to pay the difference out of his own pocket.
The apparent contention here is that the difference between the insurance company's estimates and the prices charged by plaintiffs must be borne by the insureds, who, in order to avoid paying additional money, are diverted to those shops which will work at the prevailing rate. Therefore, plaintiffs argue, defendants' conduct indirectly results in an unlawful boycott of their shops. However, such an argument has been expressly rejected as a matter of law. See *85 Frankford Hosp. v. Blue Cross of Greater Philadelphia, supra at 1111-1112; Travelers Ins. Co. v. Blue Cross of Western Pennsylvania, supra; cf. Proctor v. State Farm Mut. Auto. Ins. Co., supra. In Frankford Hospital, the court said:
"The argument is that the differential diverts Blue Cross subscribers away from member hospitals and therefore by contracting with hospitals for services Blue Cross is boycotting all hospitals with which it does not contract... As discussed above Travelers and Doctors Hospital have disposed of any notion that the terms of Blue Cross indemnity agreements in subscriber contracts and/or newspaper advertisements which Blue Cross has run constitute prohibited boycotts * * *." [at 417 F. Supp. 1111-1112]
In trying to obtain the lowest available prices defendants are doing no more than conducting their business as any rational enterprise would. Travelers Ins. Co., supra. An unlawful boycott will not result from a buyer's refusal to pay a higher price for goods or services where it can buy them at a lower price. See American Tel. & Tel. Co. v. Delta Communications Corp., 408 F. Supp. 1075 (S.D. Miss. 1976):
Irrespective of whether reasonableness under the "rule of reason" should be considered when examining a claimed per se violation or whether a refusal to deal violation is inherently limited to refusal-to-sell situations, a refusal to buy a product for more than it is worth simply cannot be a violation of the antitrust laws. [at 1101]
The alleged elements of the "boycott" lacks a factual or a legal basis.
Plaintiffs charge in count 3 that defendants "engaged in a conspiracy to fix prices," i.e., to establish the labor rate used to estimate the cost of repairs necessary to meet their obligations to their insureds. Evidently, the "conspiracy" is alleged because of events of September 1977, when defendants authorized their adjusters to calculate claims estimates using an hourly labor rate of $14 at about the same time. However, plaintiffs recognize that all companies are "different" and practices "vary" among defendants. Even prior to the alleged conspiracy to increase the rate to $14, estimates had been written by certain defendants at $15 an hour. Plaintiffs uniformly admitted the lack of facts, documents *86 or evidence, or knowledge of anyone who had such information, to support their contention of an agreement among defendants, and no application has been made for additional discovery.
In American Tel. & Tel. Co. v. Delta Communications Corp., supra, plaintiff alleged that the three major networks and AT&T had conspired to restrain trade in UHF television broadcasting industry by refusing to buy plaintiff's air time at an adequate price. The networks did offer to buy it at prices each believed that air time to be worth. As explained by the court, "the essence of the allegation is that the networks did not deal with Delta in terms Delta considered fair." The court concluded that there was simply no obligation on the part of the buyers to buy the air time at a price economically mandated by plaintiff's peculiar overhead and expenses, where the product may not be worth the price demanded by the plaintiff. Here, as in Delta Communications Corp., plaintiffs contend that defendant insurance companies have refused to pay an adequate labor price, which labor price has been set by plaintiffs. Like the networks in Delta Communications Corp., defendants have here chosen not to pay that higher price because plaintiff's product is not worth it  the same services can be obtained at many other body shops at the prevailing labor rate.
In addition, plaintiffs must, of course, establish that any alleged "boycott" in restraint of trade is the product of some contract, combination or conspiracy  i.e., a concerted refusal to deal. Plaintiffs do not point to any facts which indicate or suggest that defendants had some agreement with respect to their dealing with plaintiffs, or that they had conspired or acted in concert on this subject. Apparently, plaintiffs only indicated that an inference in this regard may be drawn from the fact that defendants have acted similarly  i.e., "conscious parallelism." But "conscious parallelism," without additional facts leading to an inference concerted action, is not enough to satisfy the statutory requirements and get the plaintiff past a motion *87 for dismissal or summary judgment. See Romac Resources Inc. v. Hartford Acc. & Indem. Co., 378 F. Supp. 543, 552 (D. Conn. 1974), where the court granted summary judgment to 30 insurance companies despite their similar conduct toward the plaintiff.
While plaintiffs allege a "conspiracy" in the fact that insurers' price changes may move in groups, they concede that in normal bargaining procedures the rates paid by all insurance companies are common knowledge throughout the entire industry. The depositions stated that in negotiating a particular estimate, the body shop operators refer to higher rates paid by other insurance companies as authority for payment of the same higher rate for the particular estimate; in other instances adjusters from one company use a lower rate paid by other companies to negotiate a lower estimate.
Under such circumstances there is no merit to plaintiffs' "conspiracy" charge. Allegations such as those made here have been found legally insufficient to support a charge of conspiracy when the "actions taken are reasonable responses to common business problems," United States v. General Motors Corp., 1974 Trade Cases ¶ 75,253 (E.D. Mich. 1974), or when the conduct is the result of "the normal working of the marketplace." Carbon Steel Prod. Corp. v. Alan Wood Steel Co., 289 F. Supp. 584, 588 (S.D.N.Y. 1968).
The claims adjustment activities of defendant insurance companies which are at the heart of this case are aimed at "controlling the spiralling claims payment * * * in the independent self-interest of each individual insurance company which adopted them." Proctor v. State Farm Mut. Auto. Ins. Co., supra at 276. The practice of the insurance companies to calculate the reimbursement for its insured based upon the lowest prevailing price in the marketplace (and to insure the integrity of that estimate by having an open list of competing shops which will generally accept it) is the very essence of competition. The Third Circuit Court of Appeals, in Travelers Ins. Co. v. Blue Cross, supra, 481 F.2d at 84 stated:

*88 In its negotiating with [suppliers of services, the insurance company] has done no more than conduct its business as every rational enterprise does, i.e., get the best deal possible. * * * To be sure, [the insurers'] initiative makes life harder for commercial competitors. * * * [The] antitrust laws, however, protect competition, not competitors; and stiff competition is encouraged, not condemned. [481 F.2d at 84; emphasis supplied]
The thrust of the antitrust laws is the prevention of trade restraining practices "which, by unwarranted interference with free competition among the suppliers of products or services, have a tendency to deprive the public of the benefits ordinarily derived from the rivalry of a number of sellers" and "prevent unreasonably high prices to the purchasers and users" of the goods or services in question. Travelers Ins. Co., supra, 361 F. Supp. 774, 780 (W.D.Pa. 1972) (and cases cited therein). As was succinctly stated for the United States Supreme Court by Justice Black in Northern P.R. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958):
The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premises that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material, progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition. [356 U.S. at 4, 78 S.Ct. at 517, 2 L.Ed. at 549]
But by their own testimony plaintiffs have indicated that they do not want to compete as to price with other body shops. Hence plaintiffs seek to use the antitrust laws as a shield from such competition; they seek to avoid "the free play of market forces" so as to eliminate the competitive influence of cheaper body shops to compel the defendants to pay their higher prices. This interpretation of the antitrust laws can not be enforced.
A summary judgment dismissing the complaint of all plaintiffs as to all defendants is granted.
NOTES
[1] N.J.S.A. 56:9-18 provides:

This act shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it.
[2] Plaintiffs admit the prevailing rate in their area has gone up from time to time, and defendants have, accordingly paid more.
[3] These characteristics of defendants' behavior were adopted by the owners of other body shops in their depositions testimony.
[4] Such lists are expressly sanctioned by insurenace regulations, N.J.A.C. 11:3-10.3(d).