**QUALITY AUTO BODY, INC.,**
**Plaintiff-Appellant,**

v.

**ALLSTATE INSURANCE COMPANY and State Farm Automobile Insurance Company, Defendants-Appellees.**

**No. 80–2345.**

United States Court of Appeals,
Seventh Circuit.

Argued April 7, 1981.

Decided Sept. 24, 1981.

Paul T. Kalinich, Glen Ellyn, Ill., for plaintiff-appellant.

William A. Montgomery, Schiff, Hardin & Waite, Alan H. Silberman, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for defendants-appellees.

Before WOOD and CUDAHY, Circuit Judges, and HOFFMAN,* Senior District Judge.

CUDAHY, Circuit Judge.

Plaintiff Quality Auto Body, Inc. ("Quality") appeals from a summary judgment for defendants, Allstate Insurance Company ("Allstate") and State Farm Mutual Automobile Insurance Company ("State Farm"), in an antitrust action involving automobile damage claim procedures. Quality's complaint, filed in August 1979, alleges that the defendant insurance companies [1] are violating Section 1 of the Sherman Act (15 U.S.C. § 1) by processing damage claims in a manner which fixes the price Quality can charge for automobile repairs and by boycotting Quality if it fails to adhere to the defendants' price. In April 1980, both defendants filed motions for summary judgment supported by affidavits and sworn depositions. Shortly thereafter, Quality conceded that there were no material issues of fact and filed a cross motion for summary judgment on the relevant issues of law. On August 19, 1980, the district court granted defendants' motion, denied plaintiff's motion and dismissed the case. Quality filed a timely appeal, and we affirm.

## I.

## THE FACTS

This case focuses on the policies and practices of the defendant insurance companies in processing automobile damage claims. Each company has developed its own system for dealing with the claims of policyholders in what it deems an economical and efficient manner. Quality does not dispute either company's explanation of the basic facts of their respective damage claim procedures.

### A. Allstate

Under the terms of an Allstate automobile insurance contract, the owner of a damaged vehicle must contact the insurer before any repairs are made. The company has the option to "pay for the loss in money or ... repair the damaged property." In either case, Allstate's liability is limited to the reasonable cost of repair or replacement with a "product of like kind and quality."

After an Allstate adjuster has examined the loss, he prepares an estimate based on his individual evaluation of the extent of the damage to the vehicle and the competitive cost of repairing that damage. The competitive rates used by Allstate are established by Allstate personnel on the basis of market information gathered from the reports of adjusters who frequent area repair shops and from the unsolicited statements of shop owners who inform the company of their rates from time to time.

Most of Allstate's claims are processed under the company's "shop of the customer's choice" policy. This policy permits the insured to choose the shop which will repair the damaged vehicle. After Allstate has prepared an estimate and determined the extent of its contractual obligation, the adjuster will attempt to reach an "agreed price" with the representative of the shop selected by the customer so that the insurance settlement will cover the entire cost of repairs (less any deductible). In the event

---

* The Honorable Walter E. Hoffman, Senior District Judge for the Eastern District of Virginia, is sitting by designation.

1. Two other defendants, Illinois Farmers Insurance Company and Aetna Casualty and Surety Company, were originally named in Quality's complaint. They were voluntarily dismissed from the lawsuit, however, on March 28, 1980 and June 13, 1980, respectively.

that Allstate is unable to reach an "agreed price" with the shop, Allstate will pay the insured an amount which represents, in the company's opinion, the competitive cost of repair. If the insured still wants his selected shop to perform the repairs, the insured must pay the difference between the company's contractual obligation and the rate charged by the shop.

When the insured has no preference or asks Allstate for a recommendation, the company provides the insured with the name of a shop or shops which will in all likelihood be willing to repair the vehicle for the price shown on the Allstate estimate. The company claims, however, that the shop remains free to change its quoted rates at any time, to question the nature and scope of the repair indicated on the estimate, to negotiate a different price for repair of the vehicle and even to refuse to perform the work at all.

Allstate will also permit certain shops to begin repairing vehicle damage insured by Allstate without waiting for the company to inspect the loss. This "direct repair program" was introduced by Allstate in 1975 allegedly to improve the quality and speed of service which the company provides to policyholders and claimants. Allstate personnel determine the circumstances under which a shop is chosen for participation in this program. The company selects shops which, based on past experience, prepare competent estimates and perform quality repairs at competitive prices. If Allstate is dissatisfied with a shop's repair work or its estimates, the company will no longer utilize the shop in the direct repair program. Allstate emphasizes that this program is not a substitute for the company's "shop of the customer's choice" policy and is used only in cases where the customer expresses no shop preference.

B. State Farm

State Farm's procedures for handling damage claims are very similar to those used by Allstate. State Farm agents appraise damage to a vehicle by evaluating the parts which need to be replaced, the price of those parts and the number of hours needed to reasonably complete the repairs. The cost of repairs is calculated at the prevailing competitive price for the required parts and labor in the relevant geographic area. This price is determined through periodic surveys of local garages conducted by State Farm personnel. The information obtained during the survey is assembled into a garage directory, which lists the names and addresses of all participating facilities in a particular area and the parts discounts and hourly labor rates charged by each facility. State Farm's prevailing competitive price generally represents the rate charged by a substantial number of the shops surveyed.

At the time this suit was filed, State Farm had determined that the prevailing competitive prices for the area serviced by Quality were $14.00 per hour for labor and 15% off the list price for new parts on domestic automobiles. These prices had been computed following a telephone survey of 86 shops (including Quality) in the area. The survey revealed that 84 of the 86 shops charged an hourly rate of $14.00 or less. Quality, however, charged $16.00 per hour and increased the rate to $20.00 per hour several months later. The survey also indicated that over 70% of the shops offered some discount off the manufacturer's suggested list price for new parts on domestic cars. Quality was one of only a handful of shops that refused to give any discount at all.

Like Allstate, State Farm permits the insured to select the garage of his choice, but the company will pay only what is "reasonable or necessary" to reimburse the owner in accordance with the terms of the applicable insurance policy. A garage is free, however, to challenge the nature and scope of the repairs listed on a State Farm estimate and may negotiate with State Farm for a modification in the amount of the damage appraisal. If an insured has no

shop preference and requests a recommendation from State Farm, the company will provide the insured with a list of conveniently located shops which will be likely to perform the required repairs at a competitive price. But State Farm emphasizes that these shops may choose to change their labor rates, parts discounts or repair policies at any time.

## C. Quality's Complaint

Quality charges that defendants have, by concerted action, established claim procedures which constitute *per se* violations of Section 1 of the Sherman Act. 15 U.S.C. § 1. Specifically, Quality maintains that defendants' repair estimates illegally fix the price which Quality may charge for labor and parts at the lowest prevailing competitive rate. If Quality seeks a higher rate, defendants inform the insured that they will pay only the prevailing competitive price and suggest that the insured remove the damaged vehicle to a shop which will perform the work at the defendants' price. Quality claims that this pricing policy artificially suppresses the rates charged for auto repair in violation of the antitrust laws.

In addition, Quality contends that the defendants maintain lists of body repair shops which agree to charge the rates established by the defendants and direct insureds to these preferred shops for automobile repairs. According to Quality, these vertical agreements not only reinforce defendants' price structure but also effectively withhold business from shops which do not participate in defendants' pricing program. Quality claims that defendants' action amounts to a boycott of non-conforming shops and also violates Section 1 of the Sherman Act.

In ruling on both plaintiff's and defendants' motions for summary judgment, the district court grouped plaintiff's claims into three categories: (1) horizontal price-fixing (involving alleged agreements between Allstate and State Farm to pay damage claims at the lowest competitive rate and to compute damage estimates on that basis); (2) vertical price-fixing (involving alleged agreements between each insurance company and "preferred" repair shops to perform work at the rate established by the company's estimate); and (3) boycotts (involving alleged efforts on the part of the insurance company to deny business to plaintiff by refusing to reimburse plaintiff at a rate which exceeds the lowest prevailing competitive rate). The court concluded, as to alleged horizontal price-fixing, that "documents submitted by defendants and uncontradicted by plaintiff conclusively establish that there have been no agreements between the defendants regarding the establishment of prices for automobile repair." *Quality Auto Body v. Allstate Insurance Co.*, 1980–2 Trade Cases ¶ 63,507 at 76,696. As to the charges of vertical price fixing, the court assumed, for the purposes of the summary judgment motion, that each of the defendants had entered into provider agreements with certain preferred shops regarding the price of repair. But after analyzing these agreements under the rule of reason, the court determined, as a matter of law, that such provider agreements do not, in and of themselves, violate the Sherman Act. Finally, the court found no factual basis to support a holding that defendants engaged in an illegal boycott of plaintiff's business. As a result, the district court granted defendants' motion for summary judgment and dismissed the case.

## II.

## DISCUSSION

Since both parties agree that there is no genuine issue of material fact in this case, our inquiry on appeal is limited to determining whether defendants were entitled to judgment as a matter of law. *MGM Grand Hotel Inc. v. Imperial Glass Co.*, 533 F.2d 486 (9th Cir.), *cert. denied*, 429 U.S. 887, 97 S.Ct. 239, 50 L.Ed.2d 168 (1976); *Lloyd v. Lawrence*, 472 F.2d 313 (5th Cir. 1973). For

the purposes of review, we examine the record and the inferences which may be drawn from it in a light most favorable to the party against whom summary judgment was granted (here, the plaintiff) and thus apply the same standard employed by the district court. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076 (8th Cir. 1980); *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540 (9th Cir. 1975). We must affirm the district court's order if, based on the uncontroverted facts, we conclude that defendants must prevail as a matter of law.

### A. Horizontal Price Fixing

Quality Auto's horizontal price-fixing claim arises under Section 1 of the Sherman Act, which proscribes any "contract, combination . . . or conspiracy in restraint of trade or commerce." 15 U.S.C. § 1. It is well settled that no liability can be predicated on Section 1 in the absence of some type of concerted action. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). In order to establish the existence of concerted action in the instant case, plaintiff "had to submit evidence from which a jury could reasonably infer that [defendants] . . . had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). *See also Klein v. American Luggage Works, Inc.*, 323 F.2d 787 (3d Cir. 1963); *United States v. Standard Oil Co.*, 316 F.2d 884 (7th Cir. 1963).

██ Quality has consistently admitted, that "there is no evidence [in the record] of horizontal agreements as such between State Farm and Allstate." Appellant's Br. at 29. Quality maintains, however, that an agreement should be inferred from defendants' alleged adherence to a "common formula" for calculating damage estimates. We do not find this argument persuasive. The uncontroverted affidavits and deposition testimony submitted by defendants establish that each company has unilaterally developed its own claim-handling procedures.

As the district court noted, each defendant uses a different method for determining the lowest prevailing competitive rate for repair work.[2] Allstate relies on informal contacts between claim adjusters and body shops. State Farm prefers to conduct periodic garage surveys. *Quality Auto*, 1980–2 Trade Cases at 76,696. At times, these methods produce identical results and both companies write estimates using the same competitive rate. But plaintiff concedes that the rates used by the defendants frequently differ. For example, in 1976, Allstate computed estimates at a $10.00 per hour labor rate while State Farm calculated labor costs at $14.00 per hour. Similarly, in 1979, Allstate set its labor rate at $12.00 per hour, but State Farm used $14.00 per hour. Supp.App. at 92–93. The existence of these variances in the rates used by the two defendants minimizes the possibility of any concerted action to fix the price of auto repair.

██ The fact that both companies occasionally write estimates at the same rate does not require a contrary result. After all, both defendants are attempting to assess prevailing market conditions, and it would not be surprising for each company on occasion to independently reach identical results. Even if we were to assume, however, that Allstate and State Farm somehow adhered to the same formula for calculating repair costs (nothing else being

---

2. Quality complains about the general unreliability and the lack of internal consistency in defendants' methods for calculating the lowest prevailing competitive rate. These objections (*e. g.* that State Farm has conducted its "annual" survey on less than an annual basis and that Allstate's procedure amounts to nothing more than selective feedback from adjusters which is then subjectively evaluated by a District Manager) are not relevant to a Section 1 claim in the absence of any evidence of concerted action between the two companies.

shown), there would be insufficient evidence here to establish the existence of concerted action or an antitrust conspiracy. Parallel behavior without more (a "plus factor")[3] is not enough to establish a Sherman Act violation. *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). In any event, the district court properly observed that even if the alleged horizontal agreement between the defendant insurers did exist, it would be immune from antitrust scrutiny under the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.*, which exempts the "business of insurance" from the antitrust laws. *Quality Auto*, 1980–2 Trade Cases at 76,693–4.[4]

As a result, we believe the undisputed facts support a conclusion that the defendants unilaterally chose to estimate damage claims at the lowest prevailing competitive rate and instituted separate systems to calculate this rate. Independent action of this nature (even if it were somehow shown to harm competition) does not violate Section 1 of the Sherman Act. *Sweeney*, 637 F.2d at 110; *Overseas Motors, Inc. v. Import Motors, Ltd.*, 375 F.Supp. 499, 531 (E.D. Mich.1974), *aff'd*, 519 F.2d 119 (6th Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975). In the absence of any proof of concerted action, we conclude that summary judgment is appropriate on the horizontal price-fixing claim. *See, e. g., Lamb's Patio Theatre, Inc. v. Universal Film Exchange, Inc.*, 582 F.2d 1068 (7th Cir.

1978); *Scranton Construction Co. v. Litton Industries Leasing Corp.*, 494 F.2d 778 (5th Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975).

### B. Vertical Price Fixing

Quality also predicates its price-fixing claim on the alleged existence of vertical arrangements between the defendant insurance companies and certain "preferred" auto repair shops, which Quality characterizes as "provider agreements." Although the district court concluded that "for the most part, formal vertical arrangements do not exist," the court assumed, for the purposes of the summary judgment motion, that a trier of fact could infer an agreement between the defendants and some body shops to perform the work for a set price. *Quality Auto*, 1980–2 Trade Cases at 76,694. On appeal, we must therefore indulge plaintiff in the same assumption.

Unlike the horizontal agreements discussed in the previous section, a vertical arrangement between an insurance company and a preferred body shop would not be immune from the antitrust laws under the McCarran-Ferguson Act. *See* note 4 *supra*. In *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), the Supreme Court examined a health insurance company's practice of entering into provider agreements with pharmacies to offer policyholders discount prices on prescription drugs.

---

3. *See* discussion of horizontal price fixing in *Weit v. Continental Illinois National Bank & Trust Co.*, 641 F.2d 457, 462–66 (7th Cir. 1981).

4. In *Group Life v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), the Supreme Court defined the "business of insurance" as (1) actions which relate to "the spreading and underwriting of a policyholder's risk," and (2) actions which relate "to the contract between the insurer and the insured." *Id.* at 211, 215, 99 S.Ct. at 1073, 1075. The Court also noted that a primary concern of Congress in passing this legislation "was that cooperative rate making efforts be exempt from the antitrust laws." *Id.* at 221, 99 S.Ct. at 1078. Thus, courts which have confronted the anti-

trust implications of horizontal agreements between insurance companies such as those alleged in the instant case have held that they constitute the "business of insurance" because they are "directly related to the relationship between the insurer and insured and [involve] claims procedures, which are an important determinant of commonly made rates and the spreading of risk." *See Proctor v. State Farm Mutual Automobile Insurance Co.*, 1980–2 Trade Cases, ¶ 63,591 at 77,139 (D.D.C.1980). *See also Bartholomew v. Virginia Chiropractors Ass'n*, 612 F.2d 812 (4th Cir. 1979), *cert. denied*, 446 U.S. 938, 100 S.Ct. 2158, 64 L.Ed.2d 791 (1980).

If the insured chose to make the purchase at a participating pharmacy, the insured paid only $2.00 for the drug and Blue Shield, the health insurer, reimbursed the pharmacy directly for the remainder of the cost. If, on the other hand, the insured selected a non-participating pharmacy, the insured paid full price for the prescription and was subsequently reimbursed by Blue Shield for 75% of the difference between that price and $2.00. After engaging in an extensive analysis of the language and legislative history of the McCarran-Ferguson Act, the Court concluded that the agreements between Blue Shield and participating pharmacies were not part of the "business of insurance" protected by the McCarran-Ferguson Act and therefore were not exempt from scrutiny under the antitrust laws.

In order to reach this conclusion, the Court drew a distinction between the "business of insurance" which is protected by the Act and the "business of insurers" which is not protected at all. The "business of insurance" was limited to activities which spread or underwrite a policyholder's risk and directly involve the relationship between an insurer and the insured. Since the provider agreements between Blue Shield and the participating pharmacies were merely arrangements for the purchase of goods, which enable the insurer to minimize cost and maximize profit, these agreements did not constitute the "business of insurance" but rather represented a "sound business practice" essentially unrelated to underwriting or the spreading of risk. *Id.* at 215, 99 S.Ct. at 1075. Thus, the Court concluded that these agreements, like "all agreements insurers may make to keep their costs under control—whether with automobile body repair shops or landlords" are not exempt from the provisions of the antitrust laws. *Id.* at 233–34, 99 S.Ct. at 1084–85.

5. The Court did not consider the antitrust implications of the Pharmacy Agreements in *Group Life* because the district court held that the agreements were immune from antitrust

Quality maintains that *Group Life* also compels a finding that the alleged provider agreements in the instant case constitute *per se* violations of the Sherman Act. Upon examination, however, we find this argument to be without merit. The Court in *Group Life* declined to express an opinion on the antitrust implications of the Pharmacy Agreements noting that a determination as to "[w]hether the Agreements are *illegal* under the antitrust laws is an entirely separate question, not now before us." *Id.* at 210, 99 S.Ct. at 1072 (emphasis in original).[5] Moreover, the government conceded in its amicus brief in the *Group Life* case that "the Pharmacy Agreements probably [did] not violate the antitrust laws." *Id.* at 210 n.5, 99 S.Ct. at 1072 n.5. Hence, *Group Life* does not support Quality's vertical price-fixing claim here.

In any event, Quality insists that the alleged agreements between the defendants and preferred shops should be deemed *per se* illegal under the antitrust laws and that the district court erred by analyzing these agreements under the rule of reason. The Supreme Court explained the significance of *per se* and rule of reason analyses in *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978):

> There are, thus, two complementary categories of antitrust analysis. In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal *per se.*' In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed. In either event, the purpose of the analysis is to form a judgment about the competitive significance of the restraint . . . .

analysis under the McCarran-Ferguson Act and never reached the merits of the underlying antitrust claims.

*Id.* at 692, 98 S.Ct. at 1365. Quality suggests that the purported provider agreements in the instant case are so blatantly anticompetitive that the court should invoke the *per se* rule and avoid "the necessity for [an] incredibly complicated and prolonged economic investigation into the entire history of the industry." Appellant's Br. at 19 n.5.

■ Particularly in view of the Supreme Court's reluctance to recognize *per se* violations of the antitrust laws without considerable knowledge of the business practice in question and the impact of those practices on competition, a *per se* analysis is not appropriate in the instant case where anticompetitive effect is far from obvious and may be non-existent. *See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). Further, no court which has examined the antitrust implications of insurance provider agreements has used a *per se* approach. *Proctor v. State Farm Mutual Insurance Co.,* 406 F.Supp. 27 (D.D.C.1975) *aff'd,* 561 F.2d 262 (D.C.Cir. 1977), *vacated and remanded,* 440 U.S. 942, 99 S.Ct. 1417, 59 L.Ed.2d 631 (1979), *on remand,* 1980–2 Trade Cases ¶ 63,591 (D.D. C.1980); *DeBonaventura v. Nationwide Mutual Insurance Co.,* 419 A.2d 942 (Del. Ch. 1980) *aff'd,* 428 A.2d 1151 (Del.1981); *Chick's Auto Body v. State Farm Mutual Automobile Insurance Co.,* 168 N.J.Super. 68, 401 A.2d 722 (1979), *aff'd per curiam,* 176 N.J.Super. 320, 423 A.2d 311 (1981). *See also Travelers Insurance Co. v. Blue Cross of Western Pennsylvania,* 481 F.2d 80 (3d Cir.), *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973). The vertical agreements, to the extent they exist here, are between buyers (the insurance companies) with apparently extensive market power and sellers (the body shops) with what, in comparison, seems slight market power. Since we find no reason on the face of things to regard dealings between such buyers and sellers as violations of the antitrust laws, we think the district court properly subjected these so-called vertical agreements to analysis under the rule of reason.

■ With the exception of Allstate's direct repair program which is premised upon an explicit agreement between the company and participating shops, we have assumed, as did the district court, that some type of informal agreement exists between the defendants and certain repair shops. Under the implicit terms of these alleged agreements, a shop which performs repair work at the company's prevailing competitive rate can expect to be placed on a "preferred" list and receive a steady stream of referrals from claim adjusters. A contract of this nature between a buyer (the insurance company) and a seller (the body shop) generally does not, without more, appear to violate the antitrust laws at all. Only if such an agreement contains restrictions on one party's activities *other than those involved in the immediate purchase and sale* does the possibility of a Sherman Act violation arise. In refusing to pay a price higher than what they regard as the competitive rate, defendants have not imposed any restriction on the repair shops beyond the immediate sales transaction. Defendants are simply taking steps to insure the best terms available in the marketplace and firmly indicating their position on price to the seller (the body shops). As the Third Circuit explained in *Travelers Insurance Co. v. Blue Cross of Western Pennsylvania,* 481 F.2d 80 (3d Cir.), *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973), "this pressure encourages [suppliers] to keep their costs down; and, for its own competitive advantage, [enables the insurer to pass] . . . along the savings thus realized to consumers. To be sure, [the insurer's] initiative makes life harder for commercial competitors. . . . The antitrust laws, however, protect competition, not competitors; and stiff competition is encouraged, not condemned." *Id.* at 84. Thus, the mere

existence of informal (or formal) provider agreements in the instant case, far from establishing a Sherman Act violation, seems merely to show aggressive and competitive dealing by the insurance companies.

Quality asserts, of course, that defendants, as large-scale purchasers of services wield substantial market power through the use of these agreements. As the nation's largest automobile insurer, State Farm collected more than $2 billion in direct premiums in 1979, and sustained slightly less than $1.2 billion in direct losses. Allstate, the second largest automobile insurer, received $1.3 billion in premiums and paid out approximately $800 million in losses. Together these two companies write more than one quarter of the nation's automobile insurance policies and pay out more than one quarter of the claims settlements in the industry. As a result, these defendants have an undeniable impact on the price structure of the auto repair market. But much as this impact may contribute to the discomfiture of the body shops, it probably rebounds to the benefit of competition and consumers. In the absence of proof of some concerted action or an abuse of defendants' buying power, the provider agreements do not illegally restrain trade. Like the small town dairy selling to the A&P, the body shops may be at a huge disadvantage as traders. But the Sherman Act provides no remedy for imbalance of market power as such, absent certain types of abuse.[6]

Thus, assuming the existence of informal vertical agreements in the instant case, plaintiff is simply unable to. establish an antitrust claim. Quality does not deny that the body shops on defendants' preferred list

are not obligated to perform work at the price set in the company's estimate. As the district court noted, "the only consequence of a refusal to perform the work at that price is that the customer will have to pay the additional charge himself, and may, as a result, decide to take his business elsewhere." *Quality Auto*, 1980–2 Trade Cases at 76,697. And it is not the fault of the defendants that car owners "have decided that the quality of workmanship and materials available at plaintiff's shops is not sufficiently superior to that furnished at the competitive or preferred prices recommended by defendants to its insureds and claimants to warrant the paying of money out of one's own pocket to make up the difference between plaintiff's prices and those offered by those shops which quote more competitive prices." *DeBonaventura*, 419 A.2d at 950.

Other courts that have analyzed the antitrust implications of the damage claim procedures established by automobile insurance companies have similarly found that the insurer's refusal to pay more than the prevailing competitive rate is not illegal. In *Proctor v. State Farm Mutual Automobile Insurance Co.*, 406 F.Supp. 27 (D.D.C.1975) *aff'd*, 561 F.2d 262 (D.C.Cir.1977), *vacated and remanded*, 440 U.S. 942, 99 S.Ct. 1417, 59 L.Ed.2d 631 (1979), *on remand*, 1980–2 Trade Cases ¶ 63,591 (D.D.C.1980), the owners of four automobile repair shops filed suit against the defendant insurance companies complaining as Quality does here that the insurers entered into a horizontal agreement to calculate damage estimates at the lowest prevailing competitive rate and implemented the agreement through the

---

**6.** Quality suggests that the defendants abused their market power by artificially suppressing the rates charged for automobile repair. When the rate is too low, some repair shops resort to dishonest practices in order to survive. These practices include: (1) charging for new parts but using old parts; (2) estimating parts that are not damaged; (3) straightening old parts but charging for new parts; (4) inflating labor hours; (5) billing for repairs which have not been performed; and (6) offering rebates and

bribes to adjusters. Although these deplorable practices may be prevalent in the auto repair industry, *in and of themselves* they are not matters the antitrust laws were intended to address. In any event, there is no evidence in the present case that defendants combined or conspired to fix or suppress the price of auto repair and no evidence that Quality or any other area shops were engaging in dishonest practices.

use of vertical arrangements with preferred shops, which agreed to perform the work at defendants' price. When the merits of these claims were finally considered,[7] however, the court concluded that the "vertical arrangements ... [did] not offend the antitrust laws." 1980–2 Trade Cases at 77,140. After noting that the questioned practices "stemmed solely from [the insurer's] desire to slow the rate of increase in the claims payments required to satisfy the companies' contractual obligations to their policyholders," the court noted,

> it is well to remind ourselves that a principal purpose of the antitrust laws is to preserve and foster competition in the market place. *Appellants' basic thrust that insurance companies must write estimates of repair costs so as to be within the prices sought by high-priced non-competitive shops clearly runs counter to these antitrust principles.*

*Id.* at 77,141 (emphasis supplied).

Similarly, in *Chick's Auto Body v. State Farm Mutual Automobile Insurance Co.,* 168 N.J.Super. 68, 401 A.2d 722 (1979), *aff'd per curiam,* 176 N.J.Super. 320, 423 A.2d 311 (1981), the auto body shops alleged, *inter alia,* that the insurers' refusal to pay more than the prevailing labor rate constituted price-fixing under the New Jersey Antitrust Act.[8] Although the court concluded that the challenged practices were immune from attack under an insurance exemption to the New Jersey antitrust laws, the court went on to consider and reject the merits of plaintiff's charges. Thus, the court stated, "the practice of the insurance companies to calculate the reimbursement for its insured based upon the lowest prevailing price in the market place (and to insure the integrity of that estimate by having an open list of competing shops which will generally accept it) is *the very essence of competition.*" *Id.,* 401 A.2d at 731–32 (emphasis supplied). *See also DeBonaventura v. Nationwide Mutual Insurance Co.,* 419 A.2d 942 (Del.Ch. 1980) *aff'd,* 428 A.2d 1151 (Del.1981).

In the instant case, the district court concluded that "the provider agreements are nothing more than contracts between a buyer and a seller determining the price of services that the seller will perform, and are not illegal." *Quality Auto,* 1980–2 Trade Cases at 76,696. This decision is not only consistent with *Proctor* and *Chick's Auto,* but is also in accord with the longstanding antitrust principle that Section 1 of the Sherman Act does not preclude a party from unilaterally determining the parties with whom it will deal and the terms on which it will transact business. *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). This is true even where, as here, the buyers are big and the sellers are comparatively small. We believe plaintiff failed to establish any contract, conspiracy or combination by defendants to fix prices through vertical arrangements with preferred repair shops.[9] Therefore, summary judgment is also appropriate on this claim.

---

**7.** In *Proctor,* the district court originally granted the defendants' motions for summary judgment holding that the insurance companies' claims adjustment practices were immune from antitrust attack under the McCarran-Ferguson Act. 15 U.S.C. § 1011 *et seq. Proctor,* 406 F.Supp. 27 (D.D.C.1975). On appeal, the D.C. Circuit affirmed the grant of summary judgment to the defendant insurers on antitrust immunity grounds. *Proctor,* 561 F.2d 262 (D.C. Cir.1977). In March of 1979, however, the Supreme Court vacated the judgment and remanded the case to the court of appeals in light of *Royal Drug. Proctor,* 440 U.S. 942, 99 S.Ct. 1417, 59 L.Ed.2d 63 (1979). The court of appeals subsequently remanded to the district court for a determination of the merits of the antitrust claim. The district court's decision on the merits is reported at 1980–2 Trade Cases ¶ 63,591 (D.D.C.1980).

**8.** The New Jersey Antitrust Act is construed to prohibit the same conduct forbidden by the federal antitrust laws. *Clairol, Inc. v. Cosmetics Plus,* 130 N.J.Super. 81, 325 A.2d 505 (1974).

**9.** Any problem here seems to involve the *structure* of the market, with giant buyers dealing with small, and relatively powerless sellers. Structure problems as such, if they do not involve concerted action, are generally not within the reach of Section 1 of the Sherman Act.

### C. Boycotts

 Finally, Quality contends that defendants' claims practices prevent plaintiff's shop from effectively competing with other repair shops which are willing to perform work at the prevailing competitive rate and therefore amount to a boycott of plaintiff's business. A boycott cognizable under the antitrust laws is a concerted refusal to deal. *See, e. g., Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Lamb's Patio Theatre, Inc. v. Universal Film Exchanges, Inc.*, 582 F.2d 1068 (7th Cir. 1978). We can find nothing in the undisputed evidence to support a claim amounting to a concerted refusal to deal. The uncontroverted facts establish that neither Allstate nor State Farm has ever refused to deal with Quality. On the contrary, a large portion of Quality's business is generated by defendants' policyholders and claimants.[10]

The gravamen of Quality's complaint does not appear to be defendants' refusal to deal but rather defendants' refusal to pay more than the prevailing competitive price for labor and new parts. Although some repair shops which charge more than the so-called prevailing competitive rate may suffer some economic losses, these losses appear basically to be the result of the shops' inability or unwillingness to meet competition. The Darwinian workings of competition (which the antitrust laws are presumably designed to foster) mean that high-cost, high-price shops tend to lose business and might even go out of business if they cannot become more competitive. Presumably, this process is in the consumer's best interest (although it may have social costs we think inappropriate to address here). Whatever sympathy one may feel for the body shops in these circumstances, the antitrust laws were not intended to provide redress for losses resulting from noncompetitive prices. *Proctor*, 561

F.2d at 274–75; *Chick's Auto Body*, 401 A.2d at 730.

 In any event, even if there were evidence that either or both defendants refused to deal with Quality, this conduct would not constitute an illegal boycott without proof of concerted action. We agree with the district court, however, that

> there is no evidence that the defendants have agreed between themselves on the list of shops to be favored or disfavored. Nor is there any evidence that either of the defendants has conspired with other body shops to exclude plaintiff's body shop from competition. Instead, what evidence there is tends to establish that each of the defendants arrives at its list of preferred repair shops as the result of a wholly autonomous process. In short, the court concludes that there can be no dispute that the defendants did not refuse to deal with plaintiff, but merely refused to pay the price it charged; and that this refusal was not a concerted effort, either between the defendants themselves or between the defendants and other body shops.

*Quality Auto*, 1980–2 Trade Cases at 76,697. Under these circumstances, the district court properly concluded that defendants' actions do not constitute an unlawful boycott and granted summary judgment on this claim.

For the foregoing reasons, the judgment of the district court is, in all respects, affirmed.

---

10. Michael Orrico, president and sole owner of Quality Auto estimates that State Farm claimants and policyholders alone account for 30 to 40% of his business. Orrico Dep. at 293, Supp. App. at 147.