Robert R. ZINSER, et al.,
Plaintiffs–Appellants,

v.

Melvin C. ROSE, et al.,
Defendants–Appellees.

No. 88–1789.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 7, 1988.
Decided Feb. 15, 1989.

Sherman L. Cohn, Washington, D.C., for plaintiffs-appellants.

William A. Montgomery, Schiff Hardin & Waite, Chicago, Ill., for defendants-appellees.

Before CUDAHY and RIPPLE, Circuit Judges, and WILL, Senior District Judge.*

CUDAHY, Circuit Judge.

The plaintiffs in this case, a group of licensed chiropractors, sued the defendant insurance companies, claims adjusting firm and two individual chiropractors for violating Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. § 15). Also included in the complaint are two pendent state claims, one for intentional interference with contractual relations and the other for violations of the Illinois Deceptive Trade Practices Act. The district court dismissed the plaintiffs' federal antitrust claim with prejudice and dismissed their state law claims without prejudice. We affirm, because there was no antitrust injury claimed in this case.

## I.

Because we review a motion to dismiss, we assume the truth of all well-pleaded allegations, affirming dismissal only if the plaintiff fails to allege any set of facts upon which relief may be granted. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed. 2d 80 (1957); *First Interstate Bank of* *Nevada v. Chapman & Cutler,* 837 F.2d 775 (7th Cir.1988). The plaintiffs are nineteen licensed chiropractors who practice in central Illinois. The defendants are twelve insurance companies, an insurance claims adjusting company, two chiropractors individually and their jointly owned consulting company. The two defendant chiropractors, Melvin Rose and Herbert Hender, own a consulting company, Professional Evaluation Services ("PES"), which contracts independently with each of the insurance companies to evaluate bills submitted to the companies for chiropractic care. Rose and Hender are themselves licensed chiropractors in practice in the Peoria area.

The plaintiffs' complaint alleges that these contractual arrangements between the insurance companies and PES constitute "parallel" vertical conspiracies whose aim is "to fix and lower the price of chiropractic care given to insureds of the Defendant insurance companies through the sham review of chiropractic care undertaken in purported review of first party health care insurance claims." Amended Complaint ¶ 16. The plaintiffs' original complaint contained a horizontal conspiracy claim, but this was dropped in the amended complaint. They do not now allege any form of horizontal conspiracy, and plaintiffs' counsel specifically disclaimed any horizontal conspiracy theory at oral argument. Instead, the essence of the charge here is that each individual contract between PES and an insurance company is a vertical conspiracy affecting the market in chiropractic services in central Illinois.

The plaintiffs further allege that even apart from the "parallel conduct" of all the defendant insurance companies together, each individual insurance company has the market power to affect the central Illinois market in chiropractic services. This market, according to the complaint, is peculiarly dependent upon the availability of insurance, because patients are not generally willing to undergo chiropractic treatment if they cannot be reimbursed by their insur-

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

ance companies. When the insurance companies, after consulting with PES, reimburse only a portion of a chiropractic bill, the plaintiff chiropractors are unwilling to collect the remaining amount from their patients because of "the substantial possibility that the patient will be alienated by such efforts and refrain from undergoing further chiropractic care." *Id.* at ¶ 21. The plaintiffs therefore claim that they have been injured by the alleged vertical conspiracies both because they have not been paid in full for services properly rendered and because they have lost patients they otherwise would have acquired.

The district court dismissed the plaintiffs' amended complaint because the plaintiffs lacked standing and because the allegations in the complaint did not assert any recognized antitrust injury. We affirm on the latter ground.

## II.

The plaintiffs urge that their complaint states a cause of action, describing the antitrust violation as follows: "Parallel conduct of insurance companies vertically combining with ... two chiropractors, licensed and holding themselves out as practitioners in the relevant market area, to fix prices for other chiropractors through the device of sham evaluations of chiropractors' bills." Brief for Appellants at 26. The business arrangement alleged in the plaintiffs' complaint is very similar to that involved in *Quality Auto Body, Inc. v. Allstate Insurance Co.*, 660 F.2d 1195 (7th Cir.1981), in which we held that arrangements made by automobile insurance companies to limit the amount they would reimburse clients for repairs did not constitute vertical (or horizontal) price fixing.

*Quality Auto Body* involved two insurance companies that employed similar practices for assessing claims under automobile insurance policies. Both Allstate Insurance Company ("Allstate") and State Farm

Mutual Insurance Company ("State Farm") had established general pricing guidelines for automobile repairs under their automobile insurance policies. Allstate based its guidelines on "market information gathered from the reports of adjusters who frequent area repair shops and from the unsolicited statements of shop owners who inform the company of their rates from time to time." *Id.* at 1197. State Farm performed "periodic surveys of local garages" and then assembled the survey information to form a directory listing "the names and addresses of all participating facilities in a particular area and the parts discounts and hourly labor rates charged by each facility." *Id.* Both insurance companies permitted their insureds to take damaged vehicles to the repair shops of their choice, but additionally maintained lists of shops likely to perform repairs within the companies' price limits. The plaintiff, Quality Auto Body, Inc. ("Quality"), claimed that the defendants' policy illegally fixed the price at which repairs could be performed. Quality further alleged that by listing certain preferred shops for their customers, the defendants had entered into vertical agreements with the preferred shops which "not only reinforce defendants' price structure but also effectively withhold business from shops which do not participate in defendants' pricing program." *Id.* at 1199.

The "preferred" repair shops that were parties to the alleged vertical agreements in *Quality Auto Body*, like the two chiropractors in the case before us, were largely responsible for providing the insurance companies with the information upon which the companies based their pricing limits.[1] These repair shops, which were themselves in the business of repairing automobiles, provided the insurance companies with pricing guidelines that were then used in transactions with nonparticipating shops. Similarly, the chiropractors in this case, who

---

1. Thus Allstate based its prices both on information gathered by adjusters who presumably frequented participating repair shops more than nonparticipating ones, and on information from "unsolicited" reports from repair shops—again, reports more likely to come from shops with which Allstate had an ongoing relationship than nonparticipating shops. State Farm expressly based its prices on the rates charged by "a substantial number" of the participating shops listed in its directory.

are themselves in the business of providing chiropractic services, give the insurance companies information that is used to set price guidelines in transactions involving other chiropractors. Indeed, the case before us is arguably weaker than *Quality Auto Body*, because here there is less of an attempt on the part of the insurance companies to steer patients to chiropractors who observe their pricing limits—the insurance companies here do not maintain lists of "preferred" chiropractors. As in *Quality Auto Body*, insureds are free to make their own choice, and they may choose chiropractors with whom the insurance company has never done business. The only effect of the "vertical conspiracy" alleged here is to limit the amount of money the insurance company will pay insureds for designated chiropractic services. As we stressed in *Quality Auto Body*, "the Sherman Act does not preclude a party from unilaterally determining the parties with whom it will deal and the terms on which it will transact business." *Id.* at 1205. Without any additional allegations of abuse or horizontal conspiracy among the insurance companies, the arrangement plaintiffs describe fails to state a valid antitrust claim. *Accord Brillhart v. Mutual Medical Ins., Inc.,* 768 F.2d 196 (7th Cir.1985); *Kartell v. Blue Shield of Massachusetts, Inc.,* 749 F.2d 922 (1st Cir.1984); *Royal Drug v. Group Life and Health Ins. Co.,* 737 F.2d 1433 (5th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985); *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.,* 675 F.2d 502 (2d Cir.1982).

The plaintiffs make much of the fact that this case does not involve any contractual relationship between chiropractors and the insurance companies, whereas *Quality Auto Body* and similar cases involved an alleged contractual relationship between the "preferred" repair shops (or their analogues in other cases) and the insurance companies. In fact, the parallel in the case before us to the alleged contractual relationship in *Quality Auto Body* is the relationship between PES and the insurance companies. That relationship is the one alleged to be a "vertical conspiracy" in this case, and it is far more explicitly contractual than were the arrangements between the insurance companies and repair shops in *Quality Auto Body*, which the court treated as informal contracts in order to give the plaintiff there the best possible case. Indeed, in the absence of some sort of agreement, there would be no vertical conspiracy, and so plaintiffs do not advance their cause by urging that no contractual relationship is involved in this case.[2]

The plaintiffs also argue somewhat mysteriously that "what is legitimate normally may be the basis of a Sherman Act claim when it is ... a sham." Brief for Appellant at 28. In support of this proposition they cite *California Motor Transport v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). *California Motor Transport* and *Noerr* deal with the problems that

---

**2.** Plaintiffs attempt to distinguish the many cases upholding insurance company arrangements of this sort by saying that those cases all involved contractual relationships between the companies and preferred *providers* of the services, whereas this does not. It is not clear why this should make a difference. The cases that approve special relationships with providers *in addition* to price limits of the sort alleged here are actually precedent supporting *both* price limiting arrangements *and* special contractual agreements with providers who agree to abide by those limits. The fact that we have only one of those here does not make cases like *Brillhart, Quality Auto Body* or *Kartell* inapposite. The relation between the plaintiffs and the insurer in this case is exactly that between the plaintiffs and insurers in those cases; the plaintiffs are providers of services who are unhappy with the rates set for their services by the insurance companies. Thus the insurance companies here are just as much potential "purchasers" of the doctors' services as were the companies in *Brillhart,* 768 F.2d at 199, and *Kartell,* 749 F.2d at 924–25. That the buyer-seller relationship is sporadic rather than ongoing—or that the relationship is not formed because the seller finds the buyer's price too low—does not materially alter the analogy.

arise when the antitrust laws come into conflict with citizens' constitutional right to jointly petition their government. While joint activity that is part of petitioning the government is generally immune from antitrust prosecution, that immunity does not apply where the apparently legal petitioning activity is "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *California Motor Transp.*, 404 U.S. at 511, 92 S.Ct. at 612 (quoting *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533). The case before us does not involve any joint petitioning of the sort at issue in those cases. *Mandeville Island Farms* deals with a horizontal conspiracy among sugar refiners to set the price they would pay for sugar beets, and so is inapposite in a vertical conspiracy case.

Indeed, much of the relevance of the plaintiffs' "sham review" argument would apply in the context of a horizontal price fixing scheme. On the one hand, the argument would indicate that two insurance companies, by participating together in a sham review, are conspiring to set prices at unreasonably low levels. Alternatively, the two defendant chiropractors are conspiring to set the prices at which their fellow chiropractors can practice—an allegation that is made clearly in the plaintiffs' brief: "[W]e have here two licensed chiropractors who hold themselves out to the public as practising in the relevant market area participating in the alleged combination to fix prices for their competitors. That practice was condemned in *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982)." Brief for Appellants at 19. *Maricopa County* is a horizontal conspiracy case, involving members' agreements establishing maximum fees for physicians belonging to two medical societies. The plaintiffs here have specifically declined to assert a hori-

zontal conspiracy claim. However, their brief often slides into horizontal conspiracy arguments, both in the "sham review" argument, and in frequent references to the "parallel" conduct of the insurance companies in this case. These arguments do not contribute to a vertical conspiracy theory, and so do nothing to advance plaintiffs' case.

### III.

The plaintiffs here have simply complained of an arrangement whereby insurance companies set limits on the amounts insureds may be reimbursed for chiropractic fees. They have not alleged any actionable abuse of market power, dishonest practice or horizontal conspiracy on the part of the insurance companies or the defendant chiropractors. As we have noted previously, "[t]he antitrust laws do not prohibit a buyer from bargaining for the best deal possible." *Brillhart*, 768 F.2d at 201 (7th Cir.1985).[3] And while the bargaining may be hard indeed when the buyer has a great deal of market power and the seller relatively little, "structure problems" inherent in "giant buyers dealing with small, and relatively powerless sellers ... if they do not involve concerted action, are generally not within the reach of Section 1 of the Sherman Act." *Quality Auto Body*, 660 F.2d at 1205 n. 9. Because the plaintiffs have failed to allege an antitrust injury, the decision of the district court is

AFFIRMED.

---

**3.** As the Supreme Court noted in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*: "The antitrust laws ... were enacted for 'the protection of *competition*, not *competitors*,'...." 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1976) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)) (emphasis in original); *see also Car-*

*gill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409 (7th Cir.1989); *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698 (7th Cir.), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984).