**Paul FELDMAN, d/b/a Norwood Pharmacy, Doretti Pharmacy, Inc., and Talcott Pharmacy, Inc., Plaintiffs,**

**v.**

**HEALTH CARE SERVICE CORPORATION, Aetna Life Insurance Company, Metropolitan Life Insurance Company, Paid Prescriptions, Inc., and Pharmaceutical Card Systems, Inc., Defendants.**

**No. 78 C 2621.**

United States District Court, N.D. Illinois, E.D.

Sept. 30, 1982.

Andrew Spiegel, Steven Ackerman, Abraham N. Goldman, Roger Wenthe, J. Craig Busey, McDermott, Will & Emery, Arthur J. Fischer, Michael B. Cohen, Chicago, Ill., for plaintiffs.

William F. Conlon, H. Blair White, Nathan P. Eimer, Sidley & Austin, Clay H. Phillips, Herbert C. Loth, Jr., Peterson, Ross, Schloerb & Seidel, Edward L. Foote, Neil E. Holman, Duane M. Kelley, Winston & Strawn, Michael R. Levinson, Roger K. Wilson, Mildred B. Levy, Kirkland & Ellis, Leonard A. Sherman, Theodore E. Desch, James K. Gardner, Steven L. Gashwiner, Sherre Binik Levene, Friedman & Koven, Lee N. Abrams, Mayer, Brown & Platt, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

### WILLIAM T. HART, District Judge.

Plaintiffs Paul Feldman (d/b/a Norwood Pharmacy), Doretti Pharmacy, Inc., and Talcott Pharmacy, Inc. ("plaintiffs"), are owners and operators of retail pharmacies in Illinois. Each has participated in the prepaid prescription drug programs which are the focus of this lawsuit. The Fourth Amended Complaint names as defendants Health Care Service Corp., Aetna Life Insurance, Metropolitan Life Insurance, Paid Prescriptions Corp., and Pharmaceutical Card Systems, Inc. ("defendants"), individually as issuers, underwriters or administrators of prescription drug insurance programs in Illinois. (For convenience, the defendants are hereinafter sometimes referred to as the "insurer(s)").

The action has been brought under 15 U.S.C. §§ 1, 2, 15, and 28 U.S.C. § 2201, and the Court has jurisdiction pursuant to 28 U.S.C. § 1337(a). Plaintiffs brought suit as a class action, naming a defendant and plaintiff class, and demanded a jury trial. A motion for class certification as to both the plaintiff and defendant class was denied on November 23, 1981. The action is now before the Court on the motion of defendants for summary judgment.[1]

### Background

The prepaid prescription drug programs[2] (often called "provider agreements") at issue in this case consist of two separate agreements. The first agreement is between the insurer and the insured. This agreement allows an insured to obtain prescription drugs from either a "participating" or "nonparticipating" pharmacy (these terms are defined below). If the insured obtains the drug from a participating pharmacy, he pays to the pharmacy a co-payment or deductible (if one exists), and after being billed by the pharmacy, the insurer pays the balance of the cost of the prescription. If, on the other hand, an insured chooses a nonparticipating pharmacy, he must pay the full retail price of the drug "up front" and must file a claim with the insurer for reimbursement. The reimbursement formula varies, but does not exceed the amount that would be reimbursed to a participating pharmacy. In general, it is more convenient and less expensive for the insured to obtain the drug from a partici-

---

1. Defendant Health Care Service Corp. has brought a counterclaim which is not relevant to decision of the instant motion.

2. While the programs at issue vary from plan to plan—and the particular costs vary among the individual plans of each defendant as well—the essential features are the same. Thus for the sake of convenience, the programs are here treated as the same. The plaintiffs and defendants do not disagree as to the basic structure of the plans.

pating pharmacy than from a nonparticipating pharmacy.

The second agreement is between the insurer and the individual pharmacy. Each agreement contains three price components: (1) the deductible or co-payment, which is collected by the pharmacy from the insured; (2) the ingredient cost, which equals or exceeds the pharmacy acquisition cost of the drug and is paid directly to the pharmacy by the insurer; and (3) the dispensing fee. This latter amount, which is intended to reflect a reasonable profit for the pharmacy, varies and is intended to reflect market prices. It too is paid directly to the pharmacy by the insurer.

The terms of the plan and the amounts of the three price components are set by the insurer. The agreement is submitted by the insurer to the pharmacy on a "take it or leave it" basis: the pharmacy may "take it" and become a "participating" pharmacy; or it may "leave it" and remain a "nonparticipating" pharmacy. While the agreement allows the participating pharmacy to discount the co-payment or deductible collected from the insured, it prohibits the pharmacy from charging the insured more than the fixed co-payment or deductible. A pharmacy is free to sign multiple agreements with several insurers.

*Plaintiffs' Complaints*

Plaintiffs filed their original complaint on June 30, 1978. The first of their several claims alleged an agreement, combination or conspiracy among the defendants to "fix, lower, stabilize and maintain the retail prices of prescription drugs and professional pharmaceutical services," in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs also alleged a combination or conspiracy between the defendants and "large retail pharmacy chains in the state of Illinois" to monopolize by setting prices and fees below the level "at which small independent pharmacies can profitably conduct business," allegedly in violation of Sections 1 and 2 of the Sherman Act. This complaint did not identify any of the "large retail chains" referred to, nor did it name any "large retail pharmacy chains" as defendants.

On March 20, 1980, plaintiffs were granted leave to file an amended complaint so as to allow them to delete the allegations of a horizontal conspiracy in the original complaint and to allege the theory of a *per se* violation of Section 1 of the Sherman Act. The amended complaint as filed on March 31, 1980 added Osco Drugs and Walgreen Drugs as new defendants, added claims under the Robinson Patman Act, and contained a new plaintiff class definition.

On October 6, 1980, this Court granted defendants' motion to strike the amended complaint, holding that the leave granted to file an amended complaint was not intended to allow the type of amendments that were made by plaintiffs.

Thereafter, on October 16, 1980, plaintiffs moved for leave to file their second amended complaint. On October 23, 1980, plaintiffs moved for leave to file their third amended complaint. On November 4, 1980, plaintiffs' motions for leave to file their second, third, and fourth amended complaints were entered and continued to November 12, 1980.

Finally, on November 12, 1980, plaintiffs were given leave to file instanter a two count Fourth Amended Complaint ("the Complaint"). Count I of the Complaint alleges that defendants' prepaid prescription programs constitute *per se* illegal price-fixing, or alternatively are unreasonable restraints of trade, injuring plaintiffs and their class of participating pharmacies in violation of Section 1 of the Sherman Act. The gravamen of Count I is that defendants' alleged "practices have set pharmacy prices and fees at a level below the usual and customary fees and prices charged by small, independent pharmacies" (Paragraph 19, Complaint), and that as a result plaintiffs have been "forced to sell their professional services and goods at artificially low prices" (Paragraph 22(c), Complaint).

Count II alleges that defendants conspired with certain unidentified chain drug stores in Illinois to monopolize certain mar-

kets in violation of Sections 1 and 2 of the Sherman Act by discounting the co-payments or deductibles set by the agreements, resulting "in the sale of pharmaceuticals and pharmacy services below usual and customary prices charged by these pharmacies to their non-third party customers" (Paragraph 26, Complaint).

## Summary Judgment

Defendants now move for summary judgment, contending that the pleadings filed and the ample discovery taken to date, combined with recent legal developments, establish that there are no genuine issues as to any material facts, and that as a matter of law they are entitled to summary judgment on both counts.

Plaintiffs oppose the summary judgment motion, arguing that there do exist genuine issues of fact and law to be resolved at trial. Plaintiffs allege that the Complaint and record establish a prima facie case of a *per se* violation under the Sherman Act. In support of their position, plaintiffs allege three alternative theories of *per se* liability.

First, they claim that the agreements between the pharmacies and the insurers constitute a form of resale price maintenance. Under this theory, plaintiffs contend that the actual drug purchaser is the consumer, that the seller is the pharmacy, and that the defendants have fixed the price of the pharmacy—consumer transaction (Count I).

Second, plaintiffs claim that the provider agreements are illegal group buying or group agency agreements to fix the sale price of pharmaceuticals. Under this theory, plaintiffs contend that defendants, their policyholders and the consumers have agreed to purchase prescription drugs at a uniform price (Count I).

Under a third theory of *per se* liability, plaintiffs allege that defendants conspired with large chain store pharmacies to monopolize the relevant retail market by discounting the co-payment or deductible (Count II).

In the alternative, plaintiffs allege that the provider agreements constitute unreasonable restraints of trade which when balanced against existing market conditions violate the antitrust laws (Count I). Plaintiffs conclude that since each theory of liability raises mixed questions of law and fact which can only be resolved at trial, the granting of summary judgment would be improper.

To obtain summary judgment the moving party must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Furthermore, the material submitted to the Court "must be viewed in the light most favorable to the opposing party," *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Quality Auto Body v. Allstate Insurance Co.,* 660 F.2d 1195, 1200 (7th Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982). Fed.R.Civ.P. 56(e) provides that when a motion for summary judgment is supported by sworn statements, the burden of proof shifts to the party opposing the motion to show that there are specific facts giving rise to a genuine issue for trial. *Weit v. Continental Illinois National Bank & Trust Co.,* 641 F.2d 457, 461 (7th Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982). "If he does not so respond, summary judgment, if appropriate, shall be entered against him." Fed.R.Civ.P. 56(e).

As a general rule summary judgment should be used "sparingly in complex antitrust litigation where motive and intent play leading roles..." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). The Seventh Circuit, however, has not interpreted *Poller* to preclude granting summary judgment in antitrust litigation. For example, in *Quality Auto Body, supra,* the court upheld the granting of summary judgment for the defendants.

## Discussion

### A. Introduction

The Court has found much case law addressing the issues presented here, and

therefore finds no need to blaze new trails. Two circuits have recently addressed virtually the identical legal and factual issues raised in plaintiffs' Complaint and have granted summary judgment for the insurers. *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross and Blue Shield of Connecticut, Inc.*, 518 F.Supp. 1100 (D.Conn. 1981), *aff'd* 675 F.2d 502 (2nd Cir.1982); and *Sausalito Pharmacy, Inc. v. Blue Shield of California*, 1981–1 Trade Cas. ¶ 63,885 (N.D.Cal.1981), *aff'd* 677 F.2d 47 (9th Cir. 1982) (*per curiam*).[3]

The decisions in the following cases have also been especially helpful in deciding the issues presented here: *Proctor v. State Farm Mutual Automobile Insurance Co.*, 675 F.2d 308 (D.C.Cir.1982); *Quality Auto Body, supra; Michigan State Podiatry Association v. Blue Cross and Blue Shield of Michigan*, 1982–2 Trade Cas. ¶ 64,801 (E.D. Mich.1982); *Blue Cross and Blue Shield of Michigan v. Michigan Association of Psychotherapy Clinics*, 1980–2 Trade Cas. ¶ 63,351 (E.D.Mich.1980).[4]

### B. *Statutes*

Section 1 of the Sherman Act provides in part as follows: "Every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations is declared to be illegal." 15 U.S.C. § 1.

Section 2 of the Sherman Act states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the Court." 15 U.S.C. § 2.

Section 4 of the Clayton Act in relevant part states: "Any person who shall be injured in his business or property by reasons of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15.

### C. *Per Se Theories*

Plaintiffs claim that the prepaid insurance plans constitute *per se* violations of Section 1 of the Sherman Act in that they fix prices. They also claim that the defendants have conspired to monopolize the relevant market, which they argue is a *per se* violation of Sections 1 and 2 of the Sherman Act.

It is true, of course, that these prepaid plans do "fix" the price of pharmaceuticals sold by participating pharmacies in two ways. First, the agreement between the insurer and the insured fixes the amount of the deductible or co-payment which the pharmacist receives directly from the insured. Second, the participating pharmacy agreement fixes the total amount of reimbursement received by the pharmacy from the insurer.

■ It is generally recognized, however, that not every agreement which fixes price gives rise to *per se* liability under the antitrust laws. *Broadcast Music Inc. v. Columbia Broadcasting Systems, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). *Per se* rules of illegality apply only to conduct that is "manifestly anticompetitive." *Continen-*

---

**3.** The Justice Department also has taken the view that virtually the identical agreements to the ones challenged here do not violate the antitrust laws. *See Group Life & Health Insurance Company v. Royal Drug*, 440 U.S. 205, 210 n. 5, 99 S.Ct. 1067, 1072 n. 5, 59 L.Ed.2d 261 (1979).

**4.** Plaintiffs have attempted to deal with the above-mentioned cases in three ways: they have tried to distinguish some; others they have insisted are wrongly decided (*Sausalito* and *Blue Cross and Blue Shield of Michigan v. Michigan Association of Psychotherapy Clinics*); and they have ignored *Medical Arts* altogether.

*tal T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557–2558, 53 L.Ed.2d 568 (1977). For the reasons stated below, the Court finds that the pharmacy agreements at issue in this case clearly do not fit into the *per se* category.[5]

### 1. *Resale Price Maintenance*

Plaintiffs' basic claim is that these agreements, which establish the maximum price the defendants will pay to participating pharmacies and the maximum price the pharmacies can charge the insureds, are the same kind of maximum price restraints, often referred to as "resale price maintenance" arrangements, struck down as *per se* illegal in *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), and *Kiefer-Stewart Co. v. Joseph E. Seagram and Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). In *Albrecht,* a newspaper publisher set maximum prices for the resale of newspapers by an independent newspaper distributor who purchased from the publisher. In *Kiefer-Stewart,* distillers set maximum prices for the resale of liquor sold by the distillers to wholesale distributors. Both cases involved situations where a maximum price was set for the resale to third parties, and both schemes were struck down. Thus the question which is determinative in the instant case is whether the agreements under attack involve third party purchasers at all.

Each federal court which has examined the question in the context of the antitrust laws has decided that an insurer paying out pursuant to its policy of insurance is actually a purchaser of goods or services, and that the insured is merely the recipient of the goods or services pursuant to the policy. *See, e.g., Sausalito Pharmacy, supra* (insurers of pharmacy plans identical to the ones at issue in the instant case are "purchasers" of prescription drugs); *Medical Arts, supra* (same as *Sausalito*); *Quality Auto Body, supra* (insurers of property damage to cars are "purchasers" of goods and services); *Proctor, supra* (same as *Quality Auto Body*); *Michigan Association of Psychotherapy Clinics, supra* (insurers for psychotherapy services are "purchasers" of services).

█ The importance of establishing the identity of the purchaser is that no *per se* violation exists under a theory of resale price maintenance where there are only two parties to the purchase and sale, because there is no "resale."

A contract … between a buyer (the insurance company) and a seller (the body shop) generally does not, without more, appear to violate the antitrust laws at all. Only if such an agreement contains restrictions on one party's activities *other than those involved in the immediate purchase and sale* does the possibility of a Sherman Act violation arise.

*Quality Auto Body, supra,* 660 F.2d at 1203 (emphasis in original).

The provider agreements do not control any sale other than the one between the insurance company and the pharmacy. The insurance company, as purchaser of the drugs, has in no way restricted the

---

**5.** In their Memorandum in Opposition to Summary Judgment, p. 58, the plaintiffs state: "There is no need to 'label' this price-fixing as vertical, horizontal, or anything else." However, more than two years ago the plaintiffs stated that they were not alleging the existence of a horizontal conspiracy. *See* Plaintiffs' Answer to Amended Interrogatory No. 5, filed July 3, 1980, which states:

    AMENDED INTERROGATORY NO. 5: Is it your contention that Health Care Service Corporation, Aetna Life and Casualty, Paid Prescriptions, PCS, Metropolitan Life Insurance Co. or any other underwriters and/or administrators of prepaid prescription programs in the state of Illinois, combined, con-

spired, or in any other way agreed with or between themselves to fix or set the retail prices of prescription drugs or professional pharmacy services or any other provisions or terms of their prepaid prescription programs?
    RESPONSE: No.

The Court finds it only fair to hold plaintiffs to their previous statements: they do not allege the existence of a horizontal conspiracy between or among the defendants. Therefore, the Court finds the recent decision in *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), which discusses horizontal restraints among competitors, to be inapplicable.

price at which the pharmacist may sell to third parties. Indeed, the provider agreements do not even contemplate resale. *Sausalito,* ¶ 63,883, at 75,607 n. 1. *See also Sitkin Smelting and Refining Co. v. FMC Corp.,* 575 F.2d 440, 446 (3rd Cir.), *cert. denied,* 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978) ("The price-fixing within the scope of the *per se* prohibition of Section 1 of the Sherman Act, however, is an agreement to fix the price to be charged in transactions with third parties, not between the contracting parties themselves").

■ There is no actual third party to this purchase and sale of drugs. *Sausalito,* ¶ 63,885 at 75,606 ("[T]he pharmacy agreements at issue here constitute agreements between the buyers and sellers of goods."); *Medical Arts,* 518 F.Supp. at 1107 ("The only price that is established by the pharmacy agreement is the price that Blue Cross will pay participating pharmacies for prescribed drugs."). "The insurers are simply *buyers* who *partially* reimburse the pharmacies for each sale of a prescription drug." Note, *Prepaid Prescription Drug Plans Under Antitrust Scrutiny: A Stern Challenge to Health Care Cost Containment,* 75 Nw.L.Rev. 506, 513 (1980) (emphasis in original). *And see Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 214, 99 S.Ct. 1067, 1074–1075, 59 L.Ed.2d 261 (1979) (In analyzing these same provider agreements in the context of the McCarran-Ferguson Act, the Court stated that "the Pharmacy Agreements . . . are merely arrangements for the purchase of goods and services by Blue Shield." Both the *Sausalito* and *Quality Auto Body* courts have interpreted this statement to be part of the holding of *Royal Drug,* rather than dictum. If this is the case, then the "purchaser" issue has already been decided.) Since the defendants are purchasers who do not resell the drugs, the maximum price-fixing cases of *Albrecht* and *Kiefer-Stewart* are inapplicable. The plaintiffs have not shown the existence of an illegal restraint based on the theory of resale price maintenance.

The plaintiffs have alleged the existence of various "contested issues of fact" which preclude summary judgment on the issue of resale price maintenance. However, plaintiffs clearly are incorrect. The identity of the purchaser is a matter of law. The nature of the transactions and the fixing of the price are uncontested. The alleged coercion of the defendants forcing the pharmacies to join the plans is unsupported by any facts whatsoever, and has been denied by the defendants under oath. The last "fact" issue plaintiffs would like to present at trial is whether these agreements are inherently anti-competitive. But the plaintiffs cannot make out even a prima facie case for price-fixing under this theory because there is no resale. Summary judgment is therefore granted on the issue of resale price maintenance.

### 2. *Group Buying*

■ Plaintiffs also contend that the defendants' plans are illegal group buying or group agency agreements or combinations to fix the sale price of pharmaceuticals in the relative market. Essentially, plaintiffs argue that defendants, their policyholder unions and companies, additional underwriters, and the cardholder consumer-patients comprise a combination which has agreed to purchase prescription drugs at a uniform fixed price and on uniform price related terms.

The cases relied on by plaintiffs for this group buying argument concern horizontal rather than vertical groups. *See Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948) (sugar refiners, normally in competition, agree to pay uniform prices for sugar beets: held *per se* illegal); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (conspiracy among major oil companies, normally competitors, to purchase gasoline at fixed prices: held *per se* illegal); *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia,* 624 F.2d 476 (4th Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981) (Blue Shield is actually a combination of physicians; physicians' re-

fusal to pay for services performed by psychologists who do not bill through physicians found to be an unreasonable restraint of trade; conspiracy exists among doctors to foreclose competition from psychologists); *National Macaroni Manufacturers Association v. F.T.C.,* 345 F.2d 421 (7th Cir. 1965) (competitors in trade association fix composition of macaroni products: held *per se* illegal); *Matter of Atlas Supply Co.,* 48 F.T.C. 53 (1951) (combination of oil companies, normally competitors, to purchase automobile parts through jointly controlled entity: held illegal).

The plaintiffs have previously stated that they do not contend that the defendants combined, conspired, or in any other way agreed *with each other* to fix prices of drugs. *See* Plaintiffs' Answer to Amended Interrogatory No. 5, *supra.* Therefore, the "group" which plaintiffs now argue exists can refer only to the relationship between a single one of the defendants and its particular policyholders.

The plaintiffs have made a showing that there may have been some communication as to the amount of the deductible and/or dispensing fees between some of the individual defendants and their respective policyholders. This does not state a case, however, for *per se* liability under the group buying theory. The insurer and the subscriber really do not act as separate entities. Instead, the drug transaction actually is "one sale [by the pharmacist] to a two-sided buyer composed of the insurer and the subscriber." Note, *supra,* at 514. The *Medical Arts* court has seemingly approved of this characterization, 675 F.2d at 505, and this Court finds it to be reasonable as well. Whatever communication allegedly took place between the insurer and the policyholder relating to the price components of the drugs was not *per se* illegal. One side of the purchaser-seller relationship merely decided what price would be a proper one from its point of view. Since the insured and the insurer are not competitors, no horizontal relationship exists and the group buying cases relied on by plaintiffs are inapposite. In sum, there is no "group."

Again, the plaintiffs claim various fact issues exist which do not permit summary judgment to be granted on the issue of the *per se* illegality of a group buying agreement. They claim this argument raises issues about the existence of the group buying agreement, its price-fixing terms, and the market mechanism for setting prices. However, these "fact issues" are not "material," Fed.R.Civ.P. 56(c), because as a matter of law the insurer and the insured do not constitute a "group." Therefore summary judgment must be granted on this theory as well.

### 3. *Per Se Conspiracy to Monopolize*

■ Plaintiffs have brought a third *per se* contention. They argue that the defendants conspired with large chain store pharmacies to monopolize, or to attempt to monopolize, the relevant market by encouraging the discount of the deductible by these chains, thereby underselling the smaller independent pharmacy. Plaintiffs claim that material issues of fact are raised regarding the existence of a conspiracy to discount the deductible, the defendants' power to exclude competitors from the relevant market, and the power of the group as a combination to exclude actual or potential competition.

After careful review of all the evidence presented by the plaintiffs, the Court must conclude that they have not shown any evidence at all that such a conspiracy existed. The fact that some of the chains decided to discount the deductible in the hope of attracting more business is certainly not, in and of itself, a showing of a conspiracy to discount prices. *Schine Chain Theatres v. United States,* 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948) (cutting prices without more is not a violation of the Sherman Act). Plaintiffs have shown no more than this, and defendants have sworn that they have not conspired. Therefore, summary judgment as to this issue also must be granted.

### D. *Rule of Reason*

Plaintiffs have stated, in the alternative, that if they cannot withstand the motion for summary judgment based on their *per se* allegations, then at least they have made

out a case for the application of the rule of reason by the trier of fact. Though the plaintiffs have given less attention to their rule of reason contentions than to their *per se* theories,[6] and the Court is tempted to say that they really "have placed all their eggs in the *per se* basket," *Medical Arts,* 518 F.Supp. at 1109, the Court will address this argument as well.

The question here focuses on whether the challenged practice imposes an "unreasonable restraint on competition" when balanced against existing market conditions. *See Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. at 49, 97 S.Ct. at 2557. Normally, this would require an extensive analysis of the market to determine whether the restraint is reasonable or unreasonable. However, after four years of broad discovery, the plaintiffs have come up with very little to show a specific negative impact on competition.

■ Plaintiffs have made two basic arguments to show the existence of such an unreasonable restraint. First, they claim they are forced to charge their "cash and carry" customers (i.e., those who are not insured by the defendants) higher prices in order to make up the difference lost on the lower amounts received by virtue of defendants' programs. In essence, they claim that the public at large must subsidize the defendants' insured.

Defendants argue that this theory should be disregarded for several reasons: (1) it was not alleged in the Complaint; (2) more than two years ago the plaintiffs stipulated that they were not alleging the existence of "any effect" on non-subscribers as a basis

for liability;[7] (3) the assertions are mere conclusions in plaintiffs' affidavits, unsupported by data and therefore insufficient to defeat the instant motion; and (4) plaintiffs lack either standing ("only the direct purchaser has standing to sue for a vendor's price-fixing violation") or an antitrust injury (the plaintiffs admit that money allegedly lost to insureds is recovered through higher prices to nonsubscribers, so plaintiffs have not been hurt) to be able to assert this claim.

While some of these arguments are not without merit, the Court relies instead on the conclusion reached by Judge Peckham when he faced the identical argument:

> To the extent that plaintiffs claim to be forced to charge cash and carry customers more in order to obtain a certain overall profit, we note that that is a business decision to be made by plaintiffs upon their entering into a contract with defendants. As such, it does not establish a price fixed for third parties by defendants nor can it be said to be an unreasonable effect on [sic] defendants' conduct.

*Sausalito,* ¶ 63,885, at 75,611 n. 2.

■ The second argument urged by plaintiffs in their effort to show an unreasonable restraint on competition is their claim that they are unable to charge the insureds who participate in defendants' plans as much as they would like.[8] That is, the plaintiffs are being denied the profits they believe are due to them. However, the antitrust laws are not intended to protect profit margins but consumer welfare. *Brunswick Corp. v. Pueblo Bowl-O-Mat., Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Brown Shoe Co. v.*

---

6. The plaintiffs devote two pages of their eighty page Memorandum in Opposition to Summary Judgment to the rule of reason argument.

7. See Plaintiffs' Answer to Amended Interrogatory No. 1, filed July 3, 1980, which states:
   AMENDED INTERROGATORY NO. 1: Is it your contention in this litigation that the defendants or any other underwriters and/or administrators of prepaid prescription programs in the State of Illinois fixed the prices of prescription drugs and professional pharmaceutical services sold to consumers not

covered by prepaid prescription drug programs?
   RESPONSE: No.
   The Court, for purposes of the instant motion, refuses to accept defendants' implicit argument that a stipulation that defendants did not "fix" the prices is equivalent to an admission that the plans have no such "effect."

8. "Said practices have set these prices and fees at a level below the usual and customary fees and prices charged by small, independent pharmacies." (Paragraph 19, Complaint).

*United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

In fact, reasonable arguments have been made that the plans under attack here potentially promote competition and efficiency. "[A]s pharmacies are free to enter into provider agreements with as many insurance companies as they desire, it is quite possible that such agreements engender competition for the business of the numerous customer beneficiaries." *Sausalito,* ¶ 63,885 at 75,610. "[I]t has been argued that prepaid drug insurance plans potentially promote competition and efficiency, for example by countering the normal insensitivity of drug prices. . . ." *Medical Arts,* 675 F.2d at 506. *See also* P. Areeda, *Antitrust Analysis: Problems, Text, Cases,* at 531 (1981) ("[S]uch a policy does not seem anticompetitive or otherwise wrongful under the antitrust laws."); Note, *supra,* Nw. L.Rev. at 518–25.

The plaintiffs have presented no specific facts [9] to show that it is consumers—rather than themselves—who are being hurt by the defendants' plans. The motion for summary judgment as to plaintiffs' rule of reason claims must be granted. *Cf. Sausalito* and *Quality Auto Body* (both courts grant summary judgment on rule of reason claims).

### Conclusion

THEREFORE IT IS ORDERED THAT defendants' motion for summary judgment is granted as to both Counts I and II of the Complaint. A status hearing is set for October 12, 1982 at 10:00 a.m.

---

**9.** Plaintiffs have relied heavily on the lengthy report of their proposed expert, Dr. Dev S. Pathak, to show the anti-competitive effects of defendants' conduct. The Court has carefully read Dr. Pathak's report. It summarizes the workings of defendants' plans (which are not in issue), comes to various legal conclusions about the state of the antitrust laws (which this Court may resolve without aid of an expert), and asserts "facts" which, in any event, this Court finds to be not material (such as the "fact" that plaintiffs have had to charge non-subscribers higher prices to make up for lost profits from the defendants' insured). The Court finds that Dr. Pathak's report will not enable the plaintiffs to withstand the motion for summary judgment.